**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/11/11

------------------------------------------------ X

**UNITED STATES OF AMERICA**

        - against -

**VIKTOR BOUT,**

             **Defendant.**

------------------------------------------------ X

**OPINION AND ORDER**

**08 Cr. 365 (SAS)**

## I.  INTRODUCTION

On March 6, 2008, Thai authorities arrested alleged international arms dealer Viktor Bout in Bangkok, Thailand, as part of an international sting operation carried out by the United States Drug Enforcement Administration ("DEA").  A grand jury in this District returned an Indictment against Bout one month later alleging his participation in conspiracies to (1) kill United States nationals,[1] (2) kill officers and employees of the United States,[2] (3) acquire, transfer, and use anti-aircraft missiles,[3] and (4) provide material support to a designated foreign terrorist organization, the *Fuerzas Armadas Revolucionarias de Colombia* (the "FARC").[4]

---

[1]  *See* 18 U.S.C. § 2332(b) ("Count One").

[2]  *See id.* §§ 1114 and 1117 ("Count Two").

[3]  *See id.* § 2332g ("Count Three").

[4]  *See id.* § 2339B ("Count Four").

-1-

On November 16, 2010, after an appeals court in Thailand reversed a lower court decision and granted the Government's extradition request, Bout was transported to the Southern District of New York, where he was presented and arraigned before this Court the following day.

Bout now moves to dismiss the Indictment in it entirety on the grounds that there is no "nexus" between him and the United States and that the Government "manufactured" jurisdiction and engaged in outrageous government conduct, all in violation of the Fifth Amendment's guarantee of due process. He also asserts specific challenges to Counts Two and Three. For the reasons that follow, Bout's motion is denied.[5]

## II.    BACKGROUND[6]

The Indictment charges that, between November 2007 and March

---

[5]    In a separate motion, Bout moves to dismiss the Indictment based on vindictive prosecution, unlawful extradition, and the "rule of speciality," and to dismiss Counts One and Two because the Government failed to allege that he acted with malice aforethought. *See* Defendant's Memorandum of Law in Support of Second Pre-Trial Motion to Dismiss the Indictment [Docket No. 35]. Bout also moves, in the instant motion, to suppress statements he made on March 6, 2008 and to remove surplusage from the Indictment. *See* Defendant's Memorandum of Law in Support of First Pre-Trial Motion to Dismiss the Indictment ("Def. Mem.") at 34-39. I addressed and resolved the surplusage argument at oral argument, *see* Transcript of 6/16/11 Oral Argument ("Tr."), and will address the remaining motions in a separate Opinion.

[6]    All facts stated herein are drawn from the Indictment.

2008, Bout and his co-conspirator, Andrew Smulian,[7] conspired to provide the FARC with millions of dollars worth of weapons to be used to kill American nationals, officers, and employees in Colombia.

### A.    The FARC

The FARC, a U.S.-designated foreign terrorist organization, is dedicated to the violent overthrow of the democratically-elected Government of Colombia and, since its inception in 1964, has evolved into the world's largest supplier of cocaine.[8]  According to the Indictment, the FARC has directed violent acts against United States persons and property interests in Colombia in order to protect its financial interests in the cocaine trade.[9]

### B.    Pre-March 6, 2008 Meetings and Communications

On January 10 and 11, 2008, Smulian and three confidential sources working with the DEA met in Curacao, Netherlands Antilles, to discuss the sale of millions of dollars' worth of weapons to the FARC.[10]  The confidential sources told

---

[7]    Smulian was charged separately in Information 08 Cr. 711 (RJS) [Docket No. 13] with the same four conspiracies with which Bout is charged.  On July 31, 2008, Smulian pled guilty to all four offenses pursuant to a cooperation agreement with the Government.

[8]    *See* Indictment ¶ 3.

[9]    *See id.* ¶ 4.

[10]    *See id.* ¶ 8(a).

-3-

Smulian that they represented the FARC and needed weapons to fight against the United States in Colombia.[11]  Roughly ten days later, Smulian met with Bout in Moscow, Russia, to discuss the arms deal.[12]  The next day, during a meeting in Copenhagen, Denmark, Smulian told one of the confidential sources that Bout had instructed him to set up a meeting to discuss the deal.[13]  From January 26, 2008 through roughly February 7, 2008, Smulian had a series of meetings with the confidential sources in Bucharest, Romania, where they continued to discuss the arms deal.[14]  During the course of these meetings, Smulian informed the confidential sources that 100 Igla surface-to-air missiles were available immediately,[15] that a delivery system was already in place for the arms,[16] that Bout could provide special helicopters that are superior to U.S. helicopters (and training to use the helicopters),[17] and that Bout could provide armor-piercing rocket

---

[11]     *See id.* ¶ 8(b).

[12]     *See id.* ¶ 8(d).

[13]     *See id.* ¶ 8(f).

[14]     *See id.* ¶ 8(l).

[15]     *See id.* ¶¶ 8(i), 8(n).

[16]     *See id.* ¶¶ 8(j), 8(u).

[17]     *See id.* ¶ 8(p).

launchers.[18]  Bout communicated directly with Smulian and the confidential

sources over the phone or via email about the arms deal throughout February of

2006[19] and ultimately indicated that he would meet the confidential sources in

Bangkok, Thailand, on March 6, 2008 to discuss the arms deal.[20]

### C.    The March 6, 2008 Meeting in Bangkok

On March 6, 2008, Bout, Smulian, and an unnamed associate of

Bout's met with two of the confidential sources at a hotel in Bangkok for

approximately two hours.[21]  During that meeting, Bout indicated that he understood

that the confidential sources sought the arms for use against U.S. forces in

Colombia, and advised that the United States was also his enemy.[22]  When the

confidential sources advised Bout that the FARC needed anti-aircraft weapons to

kill American pilots, Bout responded that he was going to prepare everything the

FARC needed.[23]  After one of the confidential sources explained that the FARC

wanted to kill American forces in Colombia, Bout indicated that the fight against

---

[18]    *See id.* ¶ 8(r).

[19]    *See id.* ¶¶ 8(t), 8(w)-(x), 8(z)-(bb).

[20]    *See id.* ¶ 8(bb).

[21]    *See id.* ¶ 8(cc).

[22]    *See id.* ¶ 8(ee).

[23]    *See id.* ¶ 8(ff).

the United States was also his fight and that he intended to supply the FARC with arms.[24]

Bout then indicated that, for about fifteen to twenty million units of some currency,[25] he could supply the FARC with (1) 700 to 800 surface-to-air missiles; (2) 5,000 AK-47 firearms; (3) millions of rounds of ammunition; (4) various Russian spare parts for rifles; (5) anti-personnel land mines and C-4 explosives; (6) night-vision equipment; (7) "ultralight" airplanes, which could be outfitted with grenade launchers and missiles; (8) unmanned aerial vehicles, which have a range of 200 to 300 kilometers;[26] and (9) two cargo planes for arms deliveries.[27]  Bout also offered to provide people to train the FARC to use the arms,[28] and said he could arrange to airdrop the arms to the FARC in Colombia, drawing a diagram to explain the delivery route.[29]

### D.    The Charges

On the basis of these allegations, the Indictment charges that Bout and

---

[24]    *See id.* ¶ 8(gg).

[25]    *See id.* ¶ 8(mm).  Bout did not specify a currency.  *See id.*

[26]    *See id.* ¶ 8(hh).

[27]    *See id.* ¶ 8(ll).

[28]    *See id.* ¶ 8(ii).

[29]    *See id.* ¶ 8(jj).

-6-

others, known and unknown, unlawfully, willfully and knowingly combined, conspired, confederated and agreed together and with each other to kill nationals,[30] officers, and employees of the United States,[31] and that it was a part and object of the conspiracy that Bout and others agreed (1) to provide the FARC with millions of dollars' worth of weapons to be used (i) to kill those nationals, officers, and employees,[32] (ii) to protect their cocaine trafficking business, and (iii) to attack U.S. interests in Columbia, knowing that the FARC had engaged and was engaging in terrorist activity and terrorism;[33] and (2) to acquire and export surface-to-air missile systems to enable the FARC to attack United States aircraft in Columbia.[34]

## III.  DUE PROCESS ARGUMENTS

### A.  Applicable Law

#### 1.  Nexus

"'[I]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a *sufficient nexus* between the defendant and the United States, *so that such application would not be*

---

[30]  *See id.* ¶ 6.

[31]  *See id.* ¶ 10.

[32]  *See id.* ¶¶ 7, 11.

[33]  *See id.* ¶ 19.

[34]  *See id.* ¶ 15.

*arbitrary or fundamentally unfair.*'"[35]  "This nexus requirement 'ensures that a United States court will assert jurisdiction only over a defendant who should reasonably anticipate being haled into court in this country.'"[36]  The "nexus" requirement is satisfied where, "[a]lthough it may be true that the Defendant did not act with the specific purpose of harming interests of or related to the United States, the evidence supports the conclusion that he was aware that the charged conduct would have such an effect."[37]

### 2.    Manufactured Jurisdiction

"[T]he 'manufactured jurisdiction' concept is properly understood not as an independent defense, but as a subset of three possible defense theories: (i) the

---

[35]    *United States v. Yousef*, 327 F.3d 56, 111 (2d Cir. 2003) ("*Yousef I*") (quoting *United States v. Davis*, 905 F.2d 245, 248-49 (9th Cir. 1990)).  *See id.* at 112 ("Given the *substantial intended effect* of [defendants' planned] attack on the United States and its citizens, it cannot be argued seriously that defendants' conduct was so unrelated to American interests as to render their prosecution in the United States arbitrary or fundamentally unfair.") (emphasis added).

[36]    *United States v. Al Kassar*, 582 F. Supp. 2d 488, 494 (S.D.N.Y. 2008) (quoting *United States v. Klimavicius-Viloria*, 144 F.3d 1249, 1257 (9th Cir. 1998)).

[37]    *United States v. Yousef*, No. S3 08 Cr. 1213, 2010 WL 3377499, at *4 (S.D.N.Y. Aug. 23, 2010) ("*Yousef II*") (application of the narco-terrorism statute to defendant, "a known international arms dealer," comported with due process where defendant agreed with a confidential informant posing as a FARC representative to exchange a cache of military-grade weapons, allegedly stolen from the American military in Iraq, for thousands of kilograms of cocaine).

defendant was entrapped into committing a federal crime, since he was not predisposed to commit the crime in the way necessary for the crime to qualify as a federal offense; (ii) [outrageous government conduct]; or (iii) *an element of the federal statute has not been proved, so federal courts have no jurisdiction over the crime*."[38]

> Courts have refused to [find the third (jurisdictional) theory of defense] when there is *any link between the federal element and a voluntary, affirmative act of the defendant*. Thus, when confronted with situations in which (i) the [Government] introduces a federal element into a non-federal crime and (ii) *the defendant then takes voluntary actions that implicate the federal element*, [the Second Circuit] has consistently held that federal jurisdiction has not been improperly "manufactured" and that the statutory elements have been met . . . .[39]

---

[38]     *United States v. Wallace*, 85 F.3d 1063, 1065-66 (2d Cir. 1996) (citations omitted) (emphasis added).  Bout has not raised an entrapment defense in his motion which, in any event, would be resolved only at trial.  *See Mathews v. United States*, 485 U.S. 58, 63 (1988) ("The question of entrapment is generally one for the jury, rather than for the court."); *Al Kassar*, 582 F. Supp. 2d at 493 (citing *Mathews*).

[39]     *Wallace*, 85 F.3d at 1066 (emphasis added) (citing and quoting the following cases for the following propositions: *United States v. LaPorta*, 46 F.3d 152, 160 (2d Cir. 1994) ("FBI informant asked defendant, suspected of being an arsonist, if he would set fire to the informant's 'daughter's car,' which was actually a government-owned car; conviction for destroying government property by fire upheld and claim of 'manufactured jurisdiction' rejected, because 'the defendants themselves committed the substantial jurisdictional act of burning the government [car]'"); *United States v. Lau Tung Lam*, 714 F.2d 209, 210-11 (2d Cir. 1983) ("DEA informant in Europe, asked by defendant whether she knew of any heroin buyers, steered defendant to drug buyers in America; conviction for conspiracy to import heroin upheld and claim of 'manufactured jurisdiction' rejected, because

### 3.      Outrageous Government Conduct

> The concept of fairness embodied in the Fifth Amendment due process guarantee is violated by government action that is fundamentally unfair or shocking to our traditional sense of justice, or conduct that is so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction against the accused. . . .  Ordinarily such official misconduct must involve either coercion or violation of the defendant's person.[40]

A sting operation – even an "elaborate" sting operation – does not violate due process where "its essential characteristic [i]s the creation of an opportunity for the commission of crime by those willing to do so."[41]

---

the defendant 'himself committed the substantial jurisdictional act of bringing drugs into the United States'"), *cert. denied*, 464 U.S. 942 (1983); *United States v. Gambino*, 566 F.2d 414, 418-19 (2d Cir. 1977) ("after government created phony garbage-collection business in the Bronx with ties to interstate commerce, defendants tried to intimidate the business into closing shop; Hobbs Act conviction upheld and claim of 'contrived jurisdiction' rejected because 'the activities of [the phony business] were necessarily wedded to interstate commerce' and because '[n]o one asked [the defendant] to threaten the FBI agent [posing as the business owner] or to hit him on the head'"), *cert. denied*, 435 U.S. 952 (1978)).

[40]      *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997) (quotation marks and citations omitted).

[41]      *United States v. Myers*, 692 F.2d 823, 837 (2d Cir. 1982).  *Accord id.* at 843 (noting that "[d]ue process challenges to an undercover agent's encouragement have been rejected when one defendant was solicited twenty times before committing an offense and when another defendant was tempted by a million-dollar cash deal and prodded by veiled threats") (citations omitted); *Hampton v. United States*, 425 U.S. 484, 495 n.7 (1976) ("Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction.") (Powell, J., concurring); *United States v. Russell*, 411 U.S.

B.      **Application**

1.      **The Indictment Alleges a Sufficient Nexus Between Bout and the United States**

Bout argues that the Government's "evidence," while pertaining to "a possible arms deal," does not "offer support to show a nexus between the defendant and harming Americans or their interests."[42]  In *United States v. Al Kassar*, the defendants were similarly charged with conspiring to sell weapons to the FARC in an effort to inflict injury on the United States and its people.[43]  Judge Jed Rakoff of this Court rejected their (identical) nexus argument, reasoning that "while defendants here may be the arms suppliers, rather than the attackers as in *Yousef [I]*, nevertheless, '[g]iven the substantial intended effect of their attack on

---

423, 431-32 (1973) (remarking that it "may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction").  *See, e.g.*, *United States v. Cromitie*, --- F. Supp. 2d ----, 09 Cr. 558, 2011 WL 1663626, at *10 (S.D.N.Y. May 3, 2011) ("This court is not familiar with a case in which so many different tactics were used on a single individual, but in the end, Cromitie justified the Government's persistence when he proved to be ready and willing to commit terrorist acts.").

[42]      Defendant's Reply to Government's Opposition to Defendant's First Pre-Trial Motion to Dismiss the Indictment ("Def. Reply") at 7.  *Accord* Def. Mem. at 10 ("Viktor Bout had no apparent connection to the United States.  The United States government sought his arrest . . . as an alleged international arms merchant, which may be viewed as reprehensible, but is not illegal under American law, absent a jurisdictional nexus to the United States.").

[43]      *See* 582 F. Supp. 2d at 494.

the United States and its citizens, it cannot be argued seriously that the defendants'

conduct was so unrelated to American interests as to render their prosecution in the

United States arbitrary or fundamentally unfair.'"[44]  Here, the Indictment alleges

that Bout offered to sell millions of dollars of weapons to the FARC *after*

acknowledging – at least three times at the March 6th meeting – his understanding

that the FARC intended to use those weapons to kill U.S. forces in Colombia.[45]  At

that point, Bout "'should [have] reasonably anticipate[d] being haled into court in

this country.'"[46]

Bout attempts to distinguish *Al-Kassar* on the grounds that "the nexus

[there] involved one defendant's discussion of how many Americans he had killed,

discussions and specific agreements that weapons supplied to the FARC would be

primarily used to kill Americans, and defendants' receipt of down payment money

---

[44]     *Id.* (quoting *Yousef I*, 327 F.3d at 112).

[45]     *See* Indictment ¶¶ 8(ee)-(gg).  Bout asserts that "[t]he gratuitous
statements made by the undercovers do not provide the necessary jurisdictional
nexus."  Def. Mem. at 22.  But it is not the statements of the confidential sources
that establish the nexus between Bout and the United States.  Rather, it is Bout's
alleged willingness to proceed with the weapons deal – armed with the information
*conveyed by* the confidential sources' gratuitous statements – that renders his
prosecution in the United States not "arbitrary or fundamentally unfair."  *Yousef I*,
327 F.3d at 112 (quotation marks omitted).

[46]     *Al Kassar*, 582 F. Supp. 2d at 494 (quoting *Klimavicius-Viloria*, 144
F.3d at 1257)).

for the weapons wired from American banks," establishing a "much more direct and significant connection between the defendant and the United States, which is utterly lacking in the instant case."[47]  Bout's argument not only conflates the doctrines of jurisdictional nexus and manufactured jurisdiction,[48] but also inserts purported support for the finding of a jurisdictional nexus in *Al Kassar* that is not found in the opinion.  To prove a sufficient nexus to the United States, the evidence need merely "support[] the conclusion that [Bout] was aware that the charged [conspiracies] would [harm interests of or related to the United States]."[49]  The Indictment sufficiently alleges such knowledge by Bout, and therefore the motion to dismiss the Indictment on the grounds of an insufficient nexus is denied.[50]

---

[47]  Def. Reply at 8-9 (citing his own moving brief's discussion of the "several active steps . . . alleged in the indictment as overt acts [in *Al Kassar*]," Def. Mem. at 21, and the allegedly weaker case for manufactured jurisdiction in that case).

[48]  Indeed, Bout's due process attack on his prosecution in the United States seems analytically rooted in an amalgamation of the three distinct legal doctrines outlined above.

[49]  *Yousef II*, 2010 WL 3377499, at *4.

[50]  In a letter to the Court dated June 20, 2011, Bout asserts that "[t]he government urges that the factual basis of [a 'constitutional nexus'] is found in that Bout took the affirmative step of traveling to Thailand to meet with 'FARC' members while he, Bout, harbored the knowledge that FARC intended the subject weapons to be used to kill Americans."  6/20/11 Letter from Bout to the Court

### 2.    The Indictment Alleges a Sufficient Link Between the "Federal Elements" of the Statutes Under Which Bout Is Charged and a Voluntary, Affirmative Act of the Defendant

Bout argues that – like the "federal officers [who] themselves supplied the interstate element and acted to ensure that an interstate element would be present" in *United States v. Archer*[51] – the Government here is "attempting to essentially police the world, by prosecuting a non-citizen who has no connection to the United States, for activities which are not American federal crimes, but for the

---

("6/20/11 Def. Letter") at 1.  Leaving aside for the moment that this assertion, too, conflates the question of a jurisdictional nexus with whether jurisdiction was manufactured, Bout mischaracterizes the basis on which the Government alleges a constitutional nexus between Bout and the United States.  Although the Government intends to present evidence at trial that Bout "rigorously researched his client" on the Internet prior to the March 6th meeting, Government's Memorandum of Law in Opposition to Defendant's First Pre-Trial Motion to Dismiss the Indictment ("Opp. Mem.") at 25 – and will ask the jury to infer from such evidence that Bout "understood . . . that the FARC . . . sought . . . to kill United States nationals" before traveling to Thailand and therefore "intended to further the FARC's terrorist objectives" when he "agree[d] to provide a multi-million dollar arsenal of military-grade weaponry to the FARC," *id.* at 28 – that evidence is not cited in the Indictment and is not necessary to allege a jurisdictional nexus between Bout and the United States, as the Government acknowledges.  *See id.* ("Bout's intent to target United States nationals through arming the FARC is unmistakably demonstrated in the approximately two-hour, recorded meeting on March 6, 2008 in Bangkok.").

[51]    486 F.2d 670, 671-74, 678-83 (2d Cir. 1973) (federal agents improperly manufactured jurisdiction where they orchestrated an elaborate sting targeting corrupt judges, defense counsel, and prosecutors in Queens County, including placing interstate calls to the targets to discuss the scheme, and prompting the targets to make interstate calls, so that otherwise-state bribery offenses could be federally prosecuted under the Travel Act).

undercover operatives' attempt to provide a sufficient nexus 'to apply extraterritorially a federal criminal statute to a defendant.'"[52]  According to Bout, just as prosecution under the Travel Act requires proof of an "interstate element," prosecution under the statutes listed in the Indictment requires "a finding of requisite extraterritorial jurisdiction" – specifically, that Bout conspired either to "[1] kill Americans, [2] affect United States' property interests, or [3] provide weapons to the FARC knowing that the FARC planned to use them against the United States."[53]  Further, the Government must then establish a link between those "federal elements" and a voluntary, affirmative act of the defendant.[54]

---

[52]     Def. Mem. at 13 (quoting *Yousef I*, 327 F.3d at 111).  *Accord id.* at 14 ("The desire to kill Americans, arguably with the weapons that Mr. Bout might supply, was rhetoric gratuitously interposed into the discussion by the undercover operatives."); *id.* at 16 ("There was no reason why this would have been important in accomplishing an arms sale, other than to create jurisdiction.  There is no other evidence alleged in the indictment that demonstrates that Viktor Bout *joined a conspiracy to sell weapons to FARC that would be used to harm Americans*.") (emphasis added).

[53]     *Id.* at 11.

[54]     I note that, while Bout characterizes this argument as one sounding in due process, this particular defense theory is grounded not in due process, but in the theory that the evidence is insufficient to show that the jurisdictional element of the statute has been proved.  *See Wallace*, 85 F.3d at 1065-66 (describing the "manufactured jurisdiction" concept as "a subset of three possible defense theories," including that "an element of the federal statute has not been proved, so federal courts have no jurisdiction over the crime"); *Archer*, 486 F.2d at 683 ("the sole issue decided" is "that the evidence here did not show a federal crime under a fair reading of the Travel Act"); *see also Cromitie*, 2011 WL

As a preliminary matter, this Court's "extraterritorial jurisdiction" over each of the Counts alleged in the Indictment does not clearly "depend[] upon" one of the three "findings" delineated by Bout.  For example, the statutes under which Bout is charged in Counts Three and Four allow for extraterritorial jurisdiction if the offense merely "occurs in or affects interstate or foreign commerce"[55] – a jurisdictional hook that the Indictment would likely satisfy even in the absence of any allegations that Bout knew the weapons deal was designed to harm American interests.[56]  Moreover, to the extent this Court's jurisdiction to try Bout for Counts One and Two "depends upon" a "finding" of killing or attempting to kill an officer, employee, or national of the United States, that "finding" is better-described as a *substantive* rather than a jurisdictional element of Counts One and Two.[57]  In other words, Bout's objection to his prosecution amounts to an

---

1663626, at *12 ("*Archer* was not even a due process case.").

[55]     18 U.S.C. § 2332g(b)(1); *id.* § 2339B(d)(1)(E).

[56]     *See* Opp. Mem. at 24 ("Nothing in the offenses alleged in Counts Three and Four, for example, requires, as a jurisdictional matter, that the material support or surface-to-air missiles be used to kill Americans or target American property.").

[57]     *Compare* 18 U.S.C. § 2332(b) (punishing "[w]hoever outside the United States . . . engages in a conspiracy to kill, a national of the United States") *and* 18 U.S.C. § 1114 (punishing "[w]hoever kills or attempts to kill any officer or employee of the United States . . . .") *with* 18 U.S.C. § 1952(a) (the Travel Act) (punishing "[w]hoever travels in interstate or foreign commerce or uses the mail or

assertion not that the Government has "introduce[d] a federal element into a non-federal crime"[58] – the situation addressed by *Archer* and *Wallace* – but that the Government ensnared him in a crime that the United States has a strong interest in prosecuting, and clear authority to prosecute extraterritorially.  But in the absence of entrapment – a defense Bout does not raise – the Government's involvement in a sting operation is properly attacked as "outrageous government conduct."[59]  The doctrine of "manufactured jurisdiction" in this context is inapposite.[60]

   Indeed, the federalism concerns animating the doctrine of manufactured jurisdiction are entirely absent here.[61]  Rather, this case involves an international sting operation centering on terrorism offenses, where the

---

any facility in interstate or foreign commerce, with intent to--(1) distribute the proceeds of any unlawful activity; or (2) commit any crime of violence to further any unlawful activity; or (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform [certain acts]").

  [58] *Wallace*, 85 F.3d at 1066 (quotation marks omitted).

  [59] *See* discussion *infra* pages 21-23.

  [60] *See* Opp. Mem. at 24 ("[T]he *Archer/Wallace* construct of a voluntary act implicating the 'federal element' may be inapposite in cases, such as international terrorism offenses, where there is no single, federal element.").

  [61] *See, e.g.*, *Cromitie*, 2011 WL 1663626, at *12 ("[*Archer*] is easily distinguished from the present case since it involved both a situation in which government informants lied not only to the targets of the investigation, but also to local law enforcement officials, prosecutors, grand juries, and judges. . . .  *Archer* . . . raised significant federalism concerns that are completely absent here.").

Government's introduction of the FARC and its intent to kill American nationals does not encroach upon a state interest, and is not made for the "purpose of transforming a local [] offense into a federal crime."[62]  In such instances, perhaps the *only* appropriate jurisdictional inquiry is whether the Government has established "a sufficient nexus between the defendant and the United States, so that [the extraterritorial application of a federal criminal statute] would not be arbitrary or fundamentally unfair"[63] – a showing that, here, the Government has sufficiently made based on the allegations in the Indictment.

        Nevertheless, assuming the applicability of *Archer/Wallace* and assuming the validity of the premise of Bout's argument – that the federal element

---

[62]     *Archer*, 486 F.2d at 681.  *See* Opp. Mem. at 23 ("[W]hereas the *Archer/Wallace* doctrine makes sense in the context of offenses such as the Travel Act, so that the assertion of federal jurisdiction does not invade the province of state and local jurisdictions, that is not the case with respect to international terrorism statutes.  There, as long as the elements of an offense are met, there is little reason to doubt that Congress intended for the statutes in question to be fully enforced.").

[63]     *Yousef I*, 327 F.3d at 111 (quotation marks omitted).  *See* Tr. at 58:10-18, 59:4-8 ("THE COURT: . . . [I]f somebody in Venezuela buys arms from somebody in Spain to do something in Venezuela, it doesn't affect us in any way, I assume you couldn't prosecute it here and wouldn't.  MR. SAHNI [counsel for the Government]:  And the reason we couldn't and wouldn't is the nexus point . . . which is a different point analytically than the manufactured jurisdiction point . . . .  THE COURT:  So long as that foreign terrorist organization intends to do something to the United States.  MR. SAHNI:  And th[e] manufactured jurisdiction cases don't specifically speak to that distinction.  The intent to do something to the United States comes from the nexus language.").

common to all four offenses is attacking United States interests – the Indictment alleges a sufficient "link between the federal element and a voluntary, affirmative act of the defendant."[64]  As in *Al-Kassar*, "the Indictment charges defendant[] with voluntarily conspiring to sell millions of dollars worth of weapons to the FARC, *with the expectation that those weapons would be used to kill United States nationals*, as well as taking active steps towards consummating that sale. . . ."[65] For example, at the meeting in Bangkok on March 6, 2008 – after thrice indicating his understanding that the confidential sources wanted the arms for use against U.S. forces in Colombia – Bout offered almost ten categories of weapons and other goods[66] for fifteen to twenty million units of some currency,[67] offered to provide military-type training to the FARC,[68] and offered to arrange to airdrop the arms in Colombia.[69]  Each of these specific offers of assistance to the FARC during the Bangkok meeting represents a voluntary, "active step[] toward consummating" the

---

[64]     *Wallace*, 85 F.3d at 1066.

[65]     *Al-Kassar*, 582 F. Supp. 2d at 494 (emphasis added) (rejecting defendants' argument that jurisdiction was manufactured).

[66]     *See* Indictment ¶¶ 8(hh), 8(ll).

[67]     *See id.* ¶ 8(mm).

[68]     *See id.* ¶ 8(ii).

[69]     *See id.* ¶ 8(jj).

charged conspiracies, "which is enough for jurisdictional purposes."[70]

        Bout argues that, "unlike in *Al Kassar*, Bout did not receive end user certificates for weapon sales, he did not provide the undercover operatives with weapon specifications, nor did he take any active steps to participate in the 'conspiracy.'"[71]  Leaving aside for the moment that Judge Rakoff did not specifically rely on these "affirmative acts" in rejecting defendants' manufactured jurisdiction argument in *Al Kassar*, there is no legally significant difference between (1) receiving a fake end-user certificate from a designated terrorist organization-client and (2) offering to sell tens of millions of dollars of weapons to that client.  Both constitute voluntary, affirmative acts toward consummating a weapons transaction that, *when taken with the knowledge of that client's goals to harm Americans*, clearly "implicate" the so-called "federal element" identified by Bout in the four conspiracies charged here – even in the absence of any evidence

---

[70]     *Al Kassar*, 582 F. Supp. 2d at 494 (citing *Wallace*, 85 F.2d at 1066).

[71]     Def. Mem. at 22-23.  *See also id.* at 21 (noting that "several active steps [were] alleged in the [*Al Kassar*] indictment as overt acts . . . , including: defendants receiving original end user certificates from Nicaragua related to the weapons transaction; defendants receiving large amounts [of] money through wire transfers for down payments on weapons or their participation in the conspiracy, some of which was sent from banks in America to their accounts; and one of the defendants providing the undercover operatives with a 'specification sheet for a surface-to-air missile system that [the defendant] agreed to obtain for the [undercover operatives]'") (citations omitted) (citing the indictment).

that Bout "harbored the knowledge that FARC intended the subject weapons to be used to kill Americans" *before* he "took the affirmative step of traveling to Thailand to meet with 'FARC' members."[72]  Bout's motion to dismiss the Indictment on this ground is therefore denied.[73]

### 3. The Government's Conduct Was Not "Outrageous"

According to Bout, "[t]he Government's overreaching in this case is

---

[72]  6/20/11 Def. Letter at 1.  Again, Bout's plane ride to Bangkok is simply not the "factual basis" "urge[d]" by the Government for Bout's nexus to the United States, *id.*, nor is it the sole link between an "affirmative step" taken by Bout and the alleged federal elements of the crimes charged.  *See* Tr. at 60:10-17 ("MR. SAHNI [counsel for the Government]: . . . [E]ven assuming that the there has to be, with respect to manufactured jurisdiction, an element that has targeting U.S. interests at its core, that's implicated here.  That's implicated even if you look before the [March 6th] meeting and even if you look [at] the actions that [Bout] takes in the meeting.").

[73]  I note that both parties expend considerable effort making arguments based on the Government's *evidence*, most of which is not even referred to in the Indictment.  *See, e.g.*, 6/20/11 Def. Letter at 1 ("It is defendant's position that [the Government's evidence of defendant's knowledge of FARC's purported criminal intentions towards United States nationals], if considered, is insufficient to establish Bout's knowledge of FARC's supposed intent to kill Americans.").  To the extent Bout's challenges are to the sufficiency of the Government's evidence to *satisfy* – as opposed to the sufficiency of the Indictment to *allege* – the "federal elements" of the crimes charged, those arguments are "not appropriately decided on a motion to dismiss."  *United States v. Alfonso*, 143 F.3d 772, 773 (2d Cir. 1988).  Whether that evidence *will* legally satisfy the jurisdictional and other elements of the crimes charged – the suggestion lurking in all of Bout's "due process" arguments – is not a question for this Court today.  *See id.* at 777 ("'[W]hen a question of federal subject matter jurisdiction is intermeshed with questions going to the merits, the issue should be determined at trial.'") (quoting *United States v. Ayarza-Garcia*, 819 F.2d 1043, 1048 (11th Cir. 1987)).

profound and exceeds all other reported cases, as a detailed examination of the [I]ndictment makes clear."[74]  Bout's "overreaching" argument appears to be a variation on his nexus/manufactured jurisdiction arguments; it is the undercover operatives' "use[] of a sting operation for the express purpose of prosecuting [Bout] in the United States"[75] that Bout finds so "outrageous."  However, as the above analysis makes clear, a sting operation that introduces alleged "federal elements" into a crime comports with due process if the defendant takes voluntary, affirmative acts implicating those elements.  Bout does not even attempt to cast such behavior as the type of conscience-shocking conduct – usually involving "the use of coercion, force, or some other 'violation of the defendant's person'"[76] – that constitutes a due process violation.  Here, "[a]t most, [Bout's] allegations merely indicate that the Government created 'an opportunity for the commission of crime by those willing to do so,' investigatory conduct that is neither novel nor

---

[74]     Def. Mem. at 10.

[75]     *Id.*

[76]     *Al Kassar*, 582 F. Supp. 2d at 492 (quoting *Schmidt*, 105 F.3d at 91) (rejecting defendants' outrageous government conduct claim where defendants "were not forced or coerced into agreeing to participate in the charged weapons transaction, and there is no indication that defendants agreed to participate in the transaction unwillingly").

nefarious."[77]  Bout's motion to dismiss on the ground of outrageous government

conduct is therefore denied.

## IV.   STATUTORY ARGUMENTS

### A.   18 U.S.C. § 1114 (Protection of Officers and Employees of the United States) Applies Extraterritorially

Bout argues that because section 1114, providing for the protection of

officers and employees of the United States, does not include a specific provision

for extraterritorial jurisdiction – unlike other sections in chapter 51 governing

homicide – it does not apply to Bout's conduct abroad.  Two courts in this district

and the Eleventh Circuit have expressly rejected this argument.[78]  For the reasons

---

[77]    *Id.* (citation omitted) (quoting *Myers*, 692 F.2d at 837).  *Accord Cromitie*, 2011 WL 1663626, at *12, 8, 18 (rejecting defendants' motion to dismiss the indictment on the ground that the Government's "manufacture of federal jurisdiction" constituted "outrageous misconduct" where "[t]he Government invented all of the details of the scheme – many of them, such as a trip to Connecticut and the inclusion of Stewart [Air Force Base] as a target, for specific legal purposes of which the defendants could not possibly have been aware (the former gave rise to federal jurisdiction and the latter mandated a twenty-five year minimum sentence)" because, in the absence of any "coercion," "duress," or "physical deprivation," the Government's conduct could not be characterized as "outrageous").

[78]    *See Al Kassar*, 582 F. Supp. 2d at 497 (reasoning that section 1114 falls into a class of "'[s]tatutes prohibiting crimes against the United States government [that] may be applied extraterritorially even in the absence of clear evidence that Congress so intended'") (quoting *United States v. Gatlin*, 216 F.3d 207, 211 (2d Cir. 2000)); *id.* ("It is beyond question that the United States Government has a strong and legitimate interest in protecting its officers and employees performing official duties abroad.  Thus, this statute, on its face, is

already stated by my colleagues Judge Rakoff and Judge Sand, Bout's motion to

dismiss Count Two on this ground is denied.

**B.      18 U.S.C. § 2332g (Conspiracy to Acquire, Transfer, and Use Anti-Aircraft Missiles )**

Bout moves to dismiss Count Three on the theories that (1) section

2332g provides for jurisdiction over a conspiracy to violate the statute if – and only

if – the conspirators have conspired with someone who is also charged with a

substantive violation of the statute; and (2) his actions do not fall under a statutory

exemption for conduct authorized by the United States government, because the

informants were acting under the authority of the DEA in negotiating the arms

deal.

**1.      18 U.S.C. § 2332g Applies to Bout's Conduct**

Subsection (a) of 18 U.S.C. § 2332g, titled "[u]nlawful conduct,"

makes it "unlawful for any person to knowingly produce, construct, otherwise

_____

clearly aimed at the Government's right to defend itself, and unquestionably prohibits a crime against the United States Government.") (quotation marks omitted); *United States v. Bin Laden*, 92 F. Supp. 2d 189, 202 (S.D.N.Y. 2000) (Sand, J.) (noting that section 1114 "is explicitly intended to protect vital United States interests, . . . a significant number of United States officers and employees perform their official duties in places outside the United States, and . . . foreign nationals are in at least as good a position as are United States nationals to kill or attempt to kill United States officers and employees"); *see also United States v. Benitez*, 741 F.2d 1312, 1317 (11th Cir. 1984) ("[A]ssault and attempted murder of DEA agents is exactly the type of crime that Congress must have intended to apply extraterritorially.").

acquire, transfer directly or indirectly, receive, possess, import, export, or use, or possess and threaten to use" an anti-aircraft missile or an anti-aircraft missile launcher.[79]  Subsection (c), "[c]riminal penalties," provides that "[a]ny person who violates, *or attempts or conspires to violate*, subsection (a) shall be fined not more than $2,000,000 and shall be sentenced to a term of imprisonment not less than 25 years or to imprisonment for life."[80]  Finally, subsection (b) provides five circumstances under which "conduct prohibited by subsection (a) is within the jurisdiction of the United States":

> (1) the offense occurs in or affects interstate or foreign commerce;
> (2) the offense occurs outside of the United States and is committed by a national of the United States;
> (3) the offense is committed against a national of the United States while the national is outside the United States;
> (4) the offense is committed against any property that is owned, leased, or used by the United States or by any department or agency of the United States, whether the property is within or outside the United States; or
> (5) an offender aids or abets any person over whom jurisdiction exists under this subsection in committing an offense under this section *or conspires with any person over whom jurisdiction exists under this subsection to commit an offense under this section*.[81]

Bout attacks this charge on a ground that presents an issue of first

---

[79]    18 U.S.C. § 2332g(a)(1)(A)-(B).

[80]    *Id.* § 2332g(c)(1) (emphasis added).

[81]    *Id.* § 2332g(b)(1)-(5) (emphasis added).

impression.  He argues that "[s]ince [subsection (b)] is the only subsection in the statute that enumerates a list of conditions conferring jurisdiction, and [subsection 2332g(b)(5)] is the sole condition pertaining to jurisdiction over a conspirator, the doctrine of *expression unius est exclusion alterius* mandates that it is the only way in which jurisdiction over a conspirator is obtained."[82]  In other words, in order for the United States to have jurisdiction over a conspirator, that conspirator must have conspired with someone (1) accused of violating the *substantive* offense of acquiring and using anti-aircraft missiles and (2) to whom at least one of subsections (b)(1)-(4) applies.  And because Bout's co-conspirator, Smulian, is charged solely with *conspiring* to violate section 2332g, Count Three must be dismissed for lack of jurisdiction.

Bout is correct that, but for subsection (b)(1)(5), the United States would lack jurisdiction over a conspirator (1) if the conspiracy in which he participated did not occur in or affect interstate or foreign commerce, (2) if he was not a national of the United States (and the offense occurred outside of the United States), or if the conspiracy in which he participated was not directed against (3) United States nationals abroad or (4) property of the United States – the first four bases for jurisdiction under subsection (b).  In such a case, in order for the United

---

[82]     Def. Mem. at 32 (footnote omitted) (citing *Barhardt v. Peabody Coal Corp.*, 537 U.S. 149, 168 (2003)).

States to have jurisdiction, the conspirator would have to be charged with conspiring *with* someone to whom at least one of subsections (b)(1)-(4) applied.[83] In other words, subsection (b)(5) makes clear that the United States need only establish jurisdiction over *one* participant in a conspiracy to exercise jurisdiction over *all* co-conspirators.

But nothing in subsection (b)(5) requires that a participant conspire with someone accused of violating the *substantive* offense of acquiring and using anti-aircraft missiles. Bout's interpretation of 2332g(b) would require "an offense under this section"[84] to mean "a *substantive* offense under this section" when that word appears nowhere in the statute. To the contrary, subsection (c) explicitly punishes substantive violators, as well as those who attempt or conspire to violate subsection (a).[85]  Subsection 2332g(b)(5) even refers to conspirators as

---

[83]  For example, in instances where the conspiracy did *not* occur in or affect interstate or foreign commerce or was *not* against United States property or against a national of the United States – jurisdictional categories (1), (3), and (4) – the United States would still have jurisdiction over a conspirator, as long as at least one of his co-conspirators was a national of the United States.

[84]  18 U.S.C. § 2332g(b)(5).

[85]  *See* Opp. Mem. at 43 ("The plain meaning of the word 'offense' in this context is properly understood to include not only the actual commission of the crime, but also an attempt or conspiracy to commit the crime.").  Indeed, if Congress intended to so limit 2332g's application to conspirators, the most logical places to do so would be in subsection (a) (defining "[u]nlawful conduct") or in subsection (c) (outlining the criminal penalty for "[a]ny person who violates, or

"offender[s]," *i.e.*, individuals capable of committing "offense[s] under this section" (section 2332g).[86]  Those "offenses" may "occur[]" or "[be] committed" in four ways in order for jurisdiction to be proper – none of which depends, in the case of a conspiracy, upon the Government's charging a substantive violation.

It is a "well-established" rule of statutory analysis that an "inquiry begins with the plain language of the statute and 'where the statutory language provides a clear answer, it ends there as well.'"[87]  The natural language of subsection (b) makes clear that jurisdiction over conspirators is proper if (1) their conspiracy occurs in or affects interstate or foreign commerce, (2) they are themselves nationals of the United States, (3) they conspired against nationals of the United States, (4) they conspired against United States property, or – if none of the above – (5) they conspired with someone over whom jurisdiction exists under subsection (b), *i.e.*, someone who falls into one of the four prior jurisdictional categories, *whether a conspirator or a substantive violator*.  The notion that only

---

attempts or *conspires to violate, subsection (a)*").  Under Bout's reading of subsection (b)(5), "[a]ny person who violates, or attempts or conspires to violate, subsection (a)" in subsection (c)(1) actually means "any person who violates, or attempts or conspires to violate subsection (a) *with a person accused of substantively violating subsection (a)*."

[86]     18 U.S.C. § 2332g(b)(5).

[87]     *See Peralta-Taveras v. Attorney General*, 488 F.3d 580, 584 (2d Cir. 2007) (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999)).

plots involving the actual use or possession of anti-aircraft missiles (as opposed to

conspiracies or attempts to use or possess them) may properly be charged under

section 2332g contravenes the plain language of the statute, and must therefore be

rejected.[88]

### 2.     Bout's Conduct Does Not Fit Within 18 U.S.C. § 2332g's Statutory Exemption

Bout's argument that the alleged conspiracy falls within section

2332g's exclusion for "conduct by or under the authority of the United States or

any department or agency thereof"[89] merits little discussion.  The exemption

provision, by its terms, applies only where conduct was "under the authority" of

the Government.  Bout's and Smulian's alleged criminal conduct – their agreement

with one another to acquire and sell weapons to the FARC – was not under that

---

[88]     Bout also directs the Court to other statutes in Chapter 113B regarding terrorism that *explicitly* define the elements of the offense to include conspiracy, arguing that "where Congress intended to include a conspiracy as an element of the offense, it knew how to do so."  *See* Def. Reply at 19 (citing 18 U.S.C. § 2332a(a) (Use of Weapons of Mass Destruction) and 18 U.S.C. § 2332f(a)(2) (Bombings of places of public use, government facilities, public transportation systems and infrastructure facilities)).  But 18 U.S.C. § 2332a and 18 U.S.C. § 2332f are simply structured differently from section 2332g; whereas subsection (a) of those statutes (1) defines the "offense" *and* (2) prescribes a corresponding penalty, section 2332g separates the definition of "unlawful conduct" in subsection (a) from the prescription of penalties in subsection (c) – a subsection that makes clear that *both* conspiracies and substantive violations constitute "offenses" under the statute.

[89]     18 U.S.C. § 2332g(a)(3)(A).

authority. Nor were they aware that the confidential sources were acting under governmental authority. To construe the statute as Bout suggests would "render nugatory any 'sting' operation or use of confidential informants to detect violations of this statute."[90] For these reasons, Bout's motion to dismiss Count Three is denied.

## V.    CONCLUSION

For the aforementioned reasons, Bout's first motion to dismiss the Indictment (and specific counts therein) is denied. The Clerk of the Court is directed to close this motion [Docket No. 24].

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      July 11, 2011
            New York, New York

---

[90]    *Al Kassar*, 582 F. Supp. 2d at 498 (calling defendants' identical argument "frivolous").

-30-

**- Appearances -**

**For the Government:**

Guruanjan Sahni
Brendan R. McGuire
Assistant United States Attorneys
United States Attorney's Office for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2491
(212) 637-2220


**For Defendant:**

Albert Y. Dayan, Esq.
Albert Y. Dayan, Law Office
80-02 Kew Gardens Road
Suite #902
Kew Gardens, New York 11415
(718) 268-9400

Kenneth J. Kaplan, Esq.
Mayo Schreiber, Jr., Esq.
Kaplan & Katzberg
760 Third Avenue
New York, New York 10017
(212) 750-3100