UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X

UNITED STATES OF AMERICA

- against -

VIKTOR BOUT,

              Defendant.
------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/25/11

<u>OPINION AND ORDER</u>

08 CR 365 (SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I. BACKGROUND

On April 22, 2011, Defendant Viktor Bout moved to suppress certain statements he made to Drug Enforcement Administration ("DEA") agents following his arrest in Bangkok, Thailand on March 6, 2008. The Government opposed the motion on May 2, 2011, and an evidentiary hearing was held on May 9, 2011. In support of his motion, Bout submitted an affidavit, dated April 12, 2011,[1] containing the following material allegations, which are uncontested unless otherwise indicated: (1) After his arrest in the Sofitel Hotel in Bangkok by fifteen to twenty police officers, who arrested him with weapons drawn, he was strip-

---

[1] *See* Bout Affidavit ("Bout Aff."), Ex. E to 4/18/11 Affirmation of Albert Y. Dayan in Support of Defendant's Motion to Suppress.

searched and his hotel room was searched.[2]  After being transferred to police headquarters, Bout was confronted with forty to fifty members of the media who took pictures of him.[3]  (2) The Thai Deputy Police Chief told him that American agents wanted to speak with him.  He responded that he did not wish to speak with the agents.[4]  (3) He told the Thai police that he would like to meet with an attorney and to see a representative of the Russian Embassy.[5]  These requests were denied.[6]  (4) About an hour after his arrest at the hotel, he was placed in a room with six or seven American agents, at which point he was advised of his rights, which he said he understood.[7]  During the interview that followed, which lasted approximately twenty minutes,[8] he advised the agents several times that he was not in a very good state of mind and needed more time before he could speak with them.[9]  He was

---

[2]   *See id.* ¶ 2.

[3]   *See id.* ¶ 3.

[4]   *See id.* ¶ 4.

[5]   *See id.*

[6]   *See id.*

[7]   *See id.* ¶ 5.  The agents testified that Bout was questioned by three agents, not six or seven.

[8]   *See* Transcript of 5/9/11 Suppression Hearing ("5/9/11 Tr.") at 25.

[9]   *See* Bout Aff. ¶ 6.

handcuffed throughout the interview.  He repeatedly asked the agents whether he could speak with them the next day.[10]  The agents advised him that they would not be able to speak with him the next day.[11]  (5) The agents informed him that he would be subject to "heat, hunger, disease and rape" in a Thai jail where he might die if he did not "cooperate with them and come back to the United States."[12]  The agents stated that "they were the only chance [Bout] had to escape the terrible conditions of a Thai jail" where he would be "abandoned" if he did not agree to cooperate with the agents and return to the United States with them.[13]

At the May 9, 2011 suppression hearing,[14] more than three years following Bout's arrest, two agents of the DEA testified.  The first witness, Agent Robert Zachariasiewicz, gave the following material testimony:  (1) He was present when Bout was arrested by twenty Thai police officers, several of whom drew their weapons.[15]  Ten DEA agents were also present although they did not

---

[10]  *See* 5/9/11 Tr. at 22-23.

[11]  *See id.*

[12]  Bout Aff. ¶ 7.  As set forth below, the agents testified that they never made these statements.

[13]  *Id.* ¶ 8.  Again, as set forth below, the agents testified that they never made these statements.

[14]  *See generally* 5/9/11 Tr.

[15]  *See id.* at 11, 12.

participate in the arrest.[16] After Bout's arrest, Bout was taken to his hotel room where the Thai police searched the room and seized Bout's belongings[17] as Bout watched.[18] Following the arrest, but prior to the interview, Bout was confronted by a large number of reporters and photographers.[19] (2) Agent Zachariasiewicz interviewed Bout in a small room in Thai police headquarters approximately two hours after Bout's arrest – at about 5 p.m.[20] The interview was attended by three U.S. agents, including Agent Zachariasiewicz.[21] The agents were not aware that Bout had asked for an attorney or asked to see a representative of the Russian Embassy.[22] (3) The agents read Bout his *Miranda* rights, which Bout acknowledged and waived.[23] (4) Agent Zachariasiewicz acknowledged that Bout twice stated he was not in a good frame of mind and asked if he could speak to the

---

[16]     *See id.* at 11.

[17]     *See id.* at 12.

[18]     *See id.* at 84.

[19]     *See id*. at 13-14.

[20]     *See id.* at 14-15.

[21]     *See id.* at 16.

[22]     *See id.* at 86.

[23]     *See id.* at 22.

agents the next day.[24]  On the second occasion, Bout stated it would be best to stop the interview because anything he said could be used against him – but the interview continued.[25]  Agent Zachariasiewicz acknowledged that he told Bout that it was unlikely that the agents would be permitted to speak to Bout the next day.[26]  He further testified that he ended the interview when Bout asked for an attorney.[27]  (5) Agent Zachariasiewicz denied that he ever told Bout that Bout would not be able to survive in a Thai jail or that he would be subject to "heat, hunger, disease, and rape,"[28] but he did acknowledge that he told Bout that "I can't believe [the conditions in the Thai jail] were particular[ly] pleasant."[29]  He also stated that he told Bout that he was facing twenty-five to life on the charges pending in the United States.[30]  (6) Agent Zachariasiewicz testified that he worked closely with the Thai authorities both before and after the arrest.[31]  For example, the items

---

[24]     *See id.*

[25]     *See id.* at 57.

[26]     *See id.* at 23.

[27]     *See id.* at 25.

[28]     *Id.* at 24.

[29]     *Id.* at 63.

[30]     *See id.*

[31]     *See id.* at 34.

seized from Bout's room were immediately given to the DEA agents.[32] Nonetheless, he testified that although he did not know what Bout told the Thai authorities during the two hours following his arrest, the Thai authorities told Agent Zachariasiewicz that Bout was willing to be interviewed by the American agents.[33] (7) Agent Zachariasiewicz denied that he knew what Bout was alleging in his suppression motion and denied that, at any point during the interview, he or any of his colleagues asked Bout to waive extradition and return to the United States with him.[34] When asked whether one of the DEA's reasons for questioning Bout was to convince him to waive extradition, Agent Zachariasiewicz responded, "Incorrect. It was made very clear to us [by the Thais] that he was not coming with us."[35]

The second witness, Agent Louis Milione, made the following material statements: (1) He was present during Bout's arrest by "seven to twelve" Thai police officers, several of whom had drawn their weapons.[36] He had worked

---

[32] *See id.* at 48 ("At some point doing the corresponding, let's say two to four hours back at the Crime Suppression Division they gave me custody of several items.").

[33] *See id.* at 53.

[34] *See id.* at 23.

[35] *Id.* at 60.

[36] *Id.* at 81.

with the Thai police prior to the arrest.[37] (2) He denied that Thai police ever told him that Bout had asked for an attorney or wanted to speak with a representative of his embassy.[38] (3) He was present at the interview, along with Agent Zachariasiewicz and another agent.[39] Bout was read his *Miranda* rights, acknowledged the rights, and waived them.[40] Bout immediately said he would prefer to speak another time because of his state of mind.[41] He said it again later in the interview.[42] Agent Milione acknowledged that Agent Zachariasiewicz told Bout it would be unlikely that the agents would be permitted to speak to him the next day.[43] (4) Agent Milione conceded that he had some idea of the allegations Bout is making in this motion through news reports, but stated he never discussed the matter with Agent Zachariasiewicz.[44] Like Agent Zachariasiewicz, he stated that no one asked Bout to waive extradition and return immediately to the United

---

[37]  *See id.* at 82.

[38]  *See id.* at 86.

[39]  *See id.* at 87.

[40]  *See id.* at 88.

[41]  *See id.* at 88-89.

[42]  *See id.* at 89.

[43]  *See id.*

[44]  *See id.* at 98.

States because the United States was "in a formal extradition process with Thailand [so] that was a[n] impossibility."[45] (5) Agent Milione testified that he does not remember any mention of the conditions of Thai jails or of informing defendant of the sentence he faced in the United States.[46]

## II. FINDINGS OF FACT

Bout was arrested by the Thai police on March 6, 2008. The agents' description of the arrest is undisputed and is therefore adopted as set forth above. The key facts of the arrest include the number of police who made the arrest – many of whom had drawn their guns – the search of his hotel room, and his exposure to a large group of reporters and photographers prior to the interview. Within an hour of his arrest Bout asked to speak to an attorney and to meet with a representative of the Russian Embassy. He also notified the Thai police that he did not wish to speak to the Americans. All of these requests were denied. It is also undisputed that the Thai police and the American agents had coordinated throughout the final events in this case and throughout the arrest process.

Many of the key facts of the interview are undisputed. Bout was questioned in English by three American agents while he was handcuffed. No

---

[45] *Id.* at 90.

[46] *See id.* at 112.

attorney or Russian representative was present. The agents concede that Bout informed them that he was not in a good frame of mind and needed more time before he would speak to them. They also concede that Bout asked whether he could speak to them the next day. Both agents testified that they told Bout that it was unlikely that the Thai police would permit them to speak to him tomorrow. I find that Bout was told that this was his only chance to speak to the agents. Agent Zachariasiewicz concedes that he told Bout he faced a potential life sentence if he was tried and convicted in the United States. Although Bout's account of the treatment he was told he would face in a Thai jail differs from the accounts of the agents, I need not determine which version to credit in order to decide this motion.

## III.   LEGAL STANDARD

Under the Fifth Amendment, which applies to a foreign national interrogated abroad but tried in the United States,[47] a confession is admissible only if it is made voluntarily.[48] The test for voluntariness requires evaluation of "the totality of the circumstances . . . to determine whether the government agents' conduct was such as to overbear [a defendant's] will to resist and bring about

---

[47] *See In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 177, 201 (2d Cir. 2008).

[48] *See, e.g.*, *Dickerson v. United States*, 530 U.S. 428, 433-34 (2000); *United States v. Orlandez-Famboa*, 320 F.3d 328, 332 (2d Cir. 2003).

confessions not freely self-determined."[49] Relevant circumstances include "the characteristics of the accused, such as his experience, background, and education; the conditions of the interrogation; and the conduct of law enforcement officials, notably, whether there was physical abuse, the period of restraint in handcuffs, and use of psychologically coercive tactics."[50] The presence or absence of counsel is also a significant factor in the totality-of-the-circumstances test "because counsel can 'assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process.'"[51] Where law enforcement officials induce a confession by means of physical violence or sleep or food deprivation, the confession must be suppressed.[52] However, the decision whether to suppress statements based on the use of threats by a government agent, absent actual physical harm or deprivation, is a "close" question.[53]

---

[49] *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir. 1993) (quotation marks and citations omitted). *Accord Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1996).

[50] *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997) ("No single criterion controls.").

[51] *Green v. Scully*, 850 F.2d 894, 902 (2d Cir. 1988) (quoting *Miranda v. Arizona*, 384 U.S. 436, 469 (1966)).

[52] *See, e.g.*, *Brooks v. Florida*, 389 U.S. 413, 414-15 (1967); *Brown v. Mississippi*, 297 U.S. 278, 282, 285-86 (1936).

[53] *Arizona v. Fulminante*, 499 U.S. 279, 285-88 (1991) (suppressing statements made to a paid FBI informant after the informant offered protection

While a defendant's waiver of his *Miranda* rights is a significant factor in the totality-of-the-circumstances analysis, it does not, by itself, moot the voluntariness inquiry.[54]  Indeed, a confession that is the product of governmental coercion must be suppressed regardless of whether *Miranda* has been complied with.[55]  Nonetheless, the Supreme Court has noted that it is "rare" for a defendant to be able to prove that when agents have adhered to the *Miranda* rule, the self-incriminating statements were nonetheless compelled.[56]  Indeed, the Supreme Court has stated, in a plurality opinion, that "litigation over voluntariness tends to end with the finding of a valid [*Miranda*] waiver."[57]

## IV.  DISCUSSION/CONCLUSIONS OF LAW

I find that under the totality of the circumstances, Bout's statements to the American agents were not voluntary.  I reach this conclusion for the following reasons:  (1) Bout had asked for counsel and to speak with his embassy.  Both requests were denied by the Thai police.  While the questioning of a suspect by American agents following the denial of counsel by a foreign police force is not a

---

from rough treatment in jail in exchange for a confession).

[54]  *See Dickerson*, 530 U.S. at 433-34.

[55]  *See Anderson*, 929 F.2d at 98.

[56]  *See Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984).

[57]  *Missouri v. Seibert*, 542 U.S. 900, 908-09 (2004).

violation of *Miranda*,[58] the absence of counsel is still a circumstance that a court may consider when deciding whether a post-arrest statement is voluntary.[59] By the same token, Bout's inability to communicate with a representative of his embassy is another factor that may be considered. (2) Bout was arrested in a foreign country in a dramatic fashion, featuring more than fifteen police officers with drawn weapons, a strip search, and a non-consensual search of his room in which his computer and personal papers were seized. Following his arrest, he was exposed to a very large number of reporters and photographers as he was taken to police headquarters. (3) Bout told the Thai police that he did not wish to speak with the Americans. Despite this notification, the Thai police produced him to the Americans for the very purpose of conducting an interview. (4) Bout was then questioned in English, which is not his native language, by three American agents, and was handcuffed throughout the interview.[60]

   At the very outset of the interview, Bout informed the Americans that

---

[58] *See United States v. Yousef*, 327 F.3d 56, 142 (2d Cir. 2003) (quotation marks and alterations omitted) (emphasis added) ("[T]he District Court properly concluded that *any request* Yousef made of the Pakistani government prior to his surrender to United States officials . . . cannot be extended to require the United States officials to proceed *as if that request was made of them*.").

[59] *See Green*, 850 F.2d at 902.

[60] *See Nelson*, 121 F.3d at 833.

he was not in a good frame of mind and needed time before he decided whether he would speak to them. This request was ignored. After having been in police custody for several hours, he asked whether he could speak with the agents the next day. He was told that this would not be possible. (5) He was informed that this was his last chance to speak with the Americans, after which he would be abandoned in a Thai jail where he would face admittedly not "particular[ly] pleasant"[61] conditions including, according to Bout, "heat, hunger, disease, and rape."[62] Under either Bout's or the agents' accounts of the agents' description of the conditions in Thai jails, I find that it constituted a credible threat of violence that coerced Bout to make statements. This is because, whether or not it was an "impossibility"[63] for Bout to return to the United States with the agents, and whether or not the agents discussed the possibility of expedited extradition with Bout during the interview, the totality of the circumstances led Bout to believe that speaking with the agents was the only way he might escape being abandoned to the rough conditions of a Thai jail.[64]

---

[61] 5/9/11 Tr. at 63.

[62] Bout Aff. ¶ 7.

[63] 5/9/11 Tr. at 90 (Agent Milione).

[64] *See United States v. Dominguez-Gabriel*, No. 09 Cr. 157, 2010 WL 1915044, at *8 (S.D.N.Y. May 12, 2010) ("'a finding of coercion need not depend

In sum, based on the totality of the circumstances just described – the dramatic arrest, followed by a strip search and a non-consensual search of his belongings; handcuffs and a perp walk; the denial of his request for an attorney and contact with his embassy; the disregard of his statements that he did not wish to meet with the Americans and then that he was not in the frame of mind to speak with them that day; and Bout's understandable belief that he would be abandoned to the rough conditions of a Thai jail if he did not cooperate with the Americans – I conclude that Bout's statements were not made voluntarily and must therefore be suppressed.

---

upon actual violence by a government agent; a credible threat is sufficient'") (quoting *Fulminate*, 499 U.S. at 287). I note that suppression was denied in *Dominguez-Gabriel*, based on the totality of the circumstances which the court found were not sufficient to have overborne defendant's will. In *Dominguez-Gabriel*, the defendant was told of the possibility that he would be extradited from the United States to Mexico, where the prison conditions would be harsh and dangerous. The court noted that the agents merely informed the defendant of the possibility of extradition, not that this would necessarily happen if he did not cooperate. Here, by contrast, Bout believed he would be abandoned to the rough conditions in the Thai jails *unless* he cooperated with the Americans and returned to the United States with the agents.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           August 25, 2011

- Appearances -

**For the Government:**

Guruanjan Sahni
Brendan R. McGuire
Assistant United States Attorneys
United States Attorney's Office for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2491
(212) 637-2220


**For Defendant:**

Albert Y. Dayan, Esq.
Albert Y. Dayan, Law Office
80-02 Kew Gardens Road
Suite #902
Kew Gardens, New York 11415
(718) 268-9400

Kenneth J. Kaplan, Esq.
Mayo Schreiber, Jr., Esq.
Kaplan & Katzberg
760 Third Avenue
New York, New York 10017
(212) 750-3100