**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X

UNITED STATES OF AMERICA

   - against -

VIKTOR BOUT,

            **Defendant.**
----------------------------------------------------------X

**OPINION AND ORDER**

**08 CR 365 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

> After fifteen months in solitary confinement with extremely minimal human contact and mobility, Viktor Bout requests that he be transferred to general population.  The Supreme Court has noted that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution" and that "'[w]hen a prison . . . practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.'"[1]  Because I "cannot simply defer to the Warden and abandon my duty to uphold the constitution,"[2] I must grant Bout's request.

**I.     FACTUAL BACKGROUND**

---

[1]      *Turner v. Safley*, 482 U.S. 78, 85 (1987) (quoting *Procunier v. Martinez*, 416 U.S. 396, 405-06 (1974)).

[2]      *Boudin v. Thomas*, 533 F. Supp. 786, 789 (S.D.N.Y. 1982).

On March 6, 2008, authorities in Thailand arrested international arms dealer Viktor Bout in Bangkok, Thailand, as part of an international sting operation carried out by the United States Drug Enforcement Administration ("DEA").  A grand jury in this District returned an Indictment against Bout one month later alleging his participation in conspiracies to (1) kill United States nationals,[3] (2) kill officers and employees of the United States,[4] (3) acquire, transfer, and use anti-aircraft missiles,[5] and (4) provide material support to a designated foreign terrorist organization, the *Fuerzas Armadas Revolucionarias de Colombia* (the "FARC").[6] On November 16, 2010, after an appeals court in Thailand reversed a lower court decision and granted the Government's extradition request, Bout was transported to the Southern District of New York, where he was presented and arraigned before this Court the following day.  Since the day he arrived in New York, now fifteen months ago, Bout has been held in the Special Housing Unit ("SHU") of the Metropolitan Correctional Center ("MCC"), pursuant to a decision of the Bureau of Prisons ("BOP").  On November 2, 2011, Bout was convicted by a jury on all four

---

[3]     *See* 18 U.S.C. § 2332(b) ("Count One").

[4]     *See id.* §§ 1114 and 1117 ("Count Two").

[5]     *See id.* § 2332g ("Count Three").

[6]     *See id.* § 2339B ("Count Four").

counts.  His sentence is now scheduled for March 12, 2012.

On February 3, 2012, Bout's counsel addressed a letter to this Court complaining that Bout's long confinement in SHU was both punitive and unnecessary.  He asked that this Court order that Bout be transferred to general population.  In support of his request, he described the conditions of SHU confinement as extremely restrictive.  Based on the letter submitted by counsel, and testimony by representatives of the Bureau of Prisons, the following is a description of the conditions of Bout's confinement in the SHU.

Essentially, Bout is in solitary confinement residing in a one-man cell in which he eats, sleeps, and washes.[7]  He spends 23 hours a day in this cell and is taken out for one hour of exercise per day in a room only slightly larger than his cell.  He is alone for his exercise period.  The cell has two small frosted glass windows that allow very little natural light or fresh air.  Other than visits with counsel, trips to court, a family visit once a week, or trips upstairs to access to electronic evidence (during trial preparation), he does not leave his cell.  While he has some limited access to commissary, it is far more restrictive than the commissary privileges available to general population prisoners.  He is only allowed one telephone call a month, which is an SHU limitation.  He has no

---

[7]  *See generally* Transcript of Proceedings ("Tr."), testimony of MCC supervisory attorney, at 6-12.

interaction with other prisoners.  When transported off the SHU, he is placed in full restraints.  Counsel concludes his letter with the claim that the prolonged solitary confinement that Bout has endured may have a serious adverse affect on his mental health.

The Court held a hearing on February 10, 2012, to permit the Government an opportunity to orally respond to Bout's complaint.  The Assistant U.S. Attorney was accompanied by the warden of the MCC, the supervisory attorney of the MCC, and a unit manager at the MCC.  The description of the conditions of the SHU summarized above was provided by the supervisory attorney of the MCC.  The reasons for placement in the SHU were provided by the warden.  These included: (1) the nature of the charges; (2) his "ability to acquire vast resources, which could easily affect an escape or harm a lot of people.  His connectivity to his associates";[8]  (3) and "his alleged leadership . . . [and] his ability to lead the other inmates and control what they can do with the outside. . . . [H]is ability to control and influence people."[9]  The Government also produced an administrative detention order dated January 20, 2011.  This order provided the following reasons for Bout's detention in the SHU.

_____

[8]      *Id.* at 16.

[9]      *Id.*

> You have been placed in administrative detention due to your having been charged with serious criminal charges, including conspiring with terrorists organizations to kill U.S. nationals and officers and providing material support to a terrorist organization. You reportedly have access to mass amounts of money and weapons and to a large criminal organization. You are reported [to have] a leadership role [which] can result in undue influence among other inmates. Your case received broad publicity, which could place you at risk and abuse by other inmates.[10]

Following the hearing, the Government made a written submission, dated February 15, 2012, in which it provided reasons for the BOP decision to house Bout in the SHU. This letter also briefly addressed the standard of review to be applied by the Court when considering a challenge to the BOP's designation. Bout's counsel submitted a brief response on February 20, 2012. In its submission, the Government repeated the justifications for continued solitary confinement in the SHU summarized above, but also added that the BOP's decision was based on Bout's "reported relationship with former Liberian President Charles Taylor and his arms trafficking in Sierra Leone."[11]

## II.    LEGAL STANDARD[12]

---

[10]     *Id.* at 26.

[11]     2/15/12 Letter from Government to the Court at 3.

[12]     The appropriate procedural mechanism for challenging placement in solitary confinement is a habeas corpus petition pursuant to section 2241 of Title 28 of the United States Code. *See United States v. Basciano*, 369 F. Supp. 2d 344,

The standard for evaluating whether prison regulations impinge on a convicted prisoner's constitutional rights is set forth in *Turner v. Safley.* In *Turner,* the Supreme Court held that to determine whether a prison regulation "burdens fundamental rights," the reviewing court asks whether the regulation is "'reasonably related' to legitimate penological objectives, or whether it represents an 'exaggerated response' to those concerns."[13] *Turner* outlined a four-factor test for evaluating whether a prison regulation that allegedly violates a constitutional right is reasonably related to a valid correctional objective. The court must consider first whether there is a "valid, rational connection" between the regulation and the legitimate governmental interest used to justify it; second, whether there are alternative means for the prisoner to exercise the right at issue; third, the impact that the desired accommodation will have on guards, other inmates, and prison resources; and fourth, the absence of "ready alternatives."[14]

Some of the *Turner* factors are a rough fit for this situation, as they

---

348 (E.D.N.Y. 2005). As the Government has not objected to construing Bout's motion as a section 2241 petition, I will treat it as such. It is also undisputed that Bout has exhausted his administrative remedies.

[13]    *Turner*, 482 U.S. at 87.

[14]    *Id.* at 89-91. *Accord United States v. El-Hage*, 213 F.3d 74, 81-82 (2d Cir. 2000); *United States v. Felipe*, 148 F.3d 101, 110 (2d Cir. 1998) (citing *Turner*, 482 U.S. at 89).

focus on determining the constitutionality of regulations applicable to all inmates rather than the propriety of a particular prisoner's conditions of confinement. More on point are a series of cases analyzing whether solitary confinement is permissible, albeit in the context of prisoners who have not yet been convicted. Because the prisoners in such cases have not yet been convicted, the Due Process Clause prohibits them from being "punished."[15]  Although this concern does not apply in the post-conviction context, where rehabilitation and punishment are valid penological interests, the pre-conviction cases provide useful guidance because they apply a test similar to *Turner*: in the absence "of an expressed intent to punish on the part of detention facility officials" the court will determine whether the "condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective."[16]  In short, both tests apply a rational basis review.   The critical difference is that punishment is a legitimate objective only in the post-conviction context.[17]

        In conducting this rational basis review, deference is accorded to the BOP's determination.  The Supreme Court has noted that courts are "'ill equipped

---

[15]     *Bell v. Wolfish*, 441 U.S. 520, 537 n.16 (1979).

[16]     *Id.* at 538.

[17]     This difference is not relevant to this decision because the BOP denies that Bout's confinement in the SHU is punitive.

to deal with the increasingly urgent problems of prison administration and reform'"[18] and that "separation of powers concerns counsel a policy of judicial restraint."[19]  However, as previously noted, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution" and "'[w]hen a prison . . . practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.'"[20]

## III.  DISCUSSION

I will apply the *Turner* test to Bout's claim of unduly harsh conditions of confinement.  However, because some of the *Turner* factors are geared toward the validity of generally applicable prison regulations,[21] rather than specific

---

[18]    *Turner*, 482 U.S. at 84 (quoting *Martinez*, 416 U.S. at 405).

[19]    *Id.* at 85.

[20]    *Id.* (quoting *Martinez*, 416 U.S. at 405-06).

[21]    Some of the cases that the Government relies on are in this inapposite context.  *See Turner*, 482 U.S. at 99-100 (invalidating a prison regulation that represented an "almost complete ban on the decision to marry" but upholding a regulation limiting correspondence by prisoners); *Benjamin v. Fraser*, 264 F.3d 175, 178, 187 (2d Cir. 2001) (denying New York City Department of Corrections' motion to terminate consent decree "concern[ing] jail conditions for pretrial detainees in Department facilities" because the  "reasonable measures ordered [by the District Court] would safeguard the detainees' constitutional rights at minimal cost to the Department and without impairing its institutional concerns"); *United States v. Felipe*, 148 F.3d 101, 110 (2d Cir. 1998) (applying *Turner* and holding that restrictions imposed on prisoner's communications as part of his sentence for a racketeering conviction were "reasonably related to legitimate penological

conditions of confinement, the test is essentially whether there is a rational basis for the BOP's decision to continue to hold Bout in the SHU.  To the extent that cases concerning pre-trial detainees apply a similar standard and are more on point,[22] I draw on them as well.

I conclude that there is no "valid, rational connection" between the BOP's decision to keep Bout in the SHU for more than fourteen months and any "legitimate governmental interests put forward to justify it."  Solitary confinement is generally intended "as short term housing,"[23] yet the Government here seeks to hold Bout indefinitely with hardly any human contact or mobility.  "[I]t is well documented that long periods of solitary confinement can have devastating effects on the mental well-being of a detainee."[24]  Even in one of the most extreme examples cited by the Government – in which a defendant was charged with being an associate of Osama Bin Laden and conveying orders to the East African cell responsible for the bombing of the U.S. embassies in Nairobi, Kenya and Dares

interests").

[22]     See *Brooks v. Terrell*, No. 10 Civ. 4009, Docket No. 7 (E.D.N.Y. Oct. 14, 2010); *Basciano*, 369 F. Supp. 2d 344; *Boudin*, 533 F. Supp. 786.

[23]     *Boudin*, 533 F. Supp. at 791.

[24]     *Basciano*, 369 F. Supp. 2d at 352-53 (citing Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 531 (1997)).

Salaam, Tanzania – the BOP eased pre-trial conditions by permitting the defendant

to have a cellmate and permitting him to have three telephone calls per week after

*fifteen months* of solitary confinement.[25]  The Government has put forward no

legitimate justification for holding Bout in such harsh conditions indefinitely, and

there is no rational basis for concluding that Bout presents a greater danger in

general population than that posed by many other inmates at the MCC.

      The BOP first relies on the nature of the charges against Bout.  While

that is surely a matter of great concern, the inquiry must not stop at a recitation of

the charges.  It must also look at the nature of the evidence that led to his

conviction.[26]  A court in the Eastern District of New York, in ordering defendants

released from administrative detention, noted that the "inevitable and erroneous

conclusion to be reached from" relying solely on the charges as a basis for solitary

---

[25]    *See United States v. El-Hage*, 213 F.3d 74, 78 (2d Cir. 2000).

[26]    Bout's counsel cited this Court to a recent case in this district where the defendants were charged with and convicted of offenses identical to those of which Bout has been convicted.  The lead defendant in that case, Monzer al Kassar, was housed in the SHU for the entirety of his incarceration prior to his post-sentencing designation.  He spent ten months in the SHU.  His co-defendant, Felip Moreno-Godoy, spent six months in the SHU and was then transferred to general population for the next nine months.  He was transferred back to the SHU as a result of disciplinary infractions.  The third co-defendant, Tareq al Ghazi, was housed in the SHU for six months.  He was then transferred to general population for the next five months.  After a period of time in a hospital, he was returned to general population for the next six months.  *See* 2/15/12 Affirmation of Adam Johnson, Supervisory Staff Attorney at the MCC ("Johnson Aff.").

-10-

confinement "is that *every* defendant indicted for [such crimes] should be placed in administrative detention."[27]  This case differs significantly from a standard terrorism case.  As noted earlier, Bout was approached by government agents, posing as members of the FARC (a terrorist organization) and after many conversations agreed to sell them arms.  There was absolutely no evidence at trial that he had any connection (now or ever) to any member of the FARC.  To the contrary, the evidence showed that Bout performed research on the FARC because he knew little about them and that he was initially not inclined to do business with such an organization.  Indeed, the evidence did not reveal any ties to any terrorist organization in the last ten years.  Completely unsubstantiated allegations of "affiliation with a terrorist organization is not sufficient cause" to single out a prisoner for administrative detention.[28]  Moreover, there was never any evidence offered at trial that Bout himself engaged in violent acts; rather, the evidence showed that he was a businessman engaged in arms trafficking.[29]

The next factor cited by the BOP – namely his "ability to acquire vast

---

[27]     *United States v. Gotti*, 755 F. Supp. 1159, 1165 (E.D.N.Y. 1991) (emphasis added).

[28]     *Boudin*, 533 F. Supp. at 791.

[29]     *See Brooks*, No. 10 Civ. 4009, Docket No. 7 at 19 (noting that the prisoner had "no history of violence" and ordering transfer from the SHU to general population).

resources, which could easily affect an escape or harm a lot of people. . . [and] his connectivity to his associates" is simply not supported by any evidence produced at trial or by the Government at the hearing on this request.  Rather, the evidence at trial showed that Bout has been blacklisted by the Office of Foreign Assets Control and the United Nations, which impedes any ability to transfer assets.  I have seen no evidence that since his arrest he has had any ability to acquire vast resources – of either money or weapons – and the Government has proffered no evidence to substantiate a concern that Bout presents an unusually high risk of escape or harm to others.

The BOP next cites "his alleged leadership . . . [and] his ability to lead the other inmates and control what they can do with the outside. . . . [H]is ability to control and influence people."  This too is a conclusory statement with no support in the record.  It is true that Bout is well educated and managed a business; however, a broad generalization that any person with these characteristics poses a security risk is not a legitimate justification for solitary confinement.  The BOP has produced no support for the proposition that Bout will attempt to control and influence other inmates – it relies on pure speculation.  In the event that Bout does attempt to influence the other inmates in a manner detrimental to prison security, than the propriety of placing him in the SHU may be revisited, but I note that there

is no indication that he will do so.

The BOP has also mentioned, in its administrative detention order, the broad publicity this case has received.  This is a very weak and dangerous argument.  Many, many defendants – such as white collar defendants engaged in fraud, or mobsters involved in the Mafia – receive broad publicity, but the defendants nonetheless are released on bail or assigned to general population.  In sum, the justifications in the BOP's thirteen-month old administrative detention order are broad generalizations that do not provide any rational explanation for imposing such a severe constraint on Bout's liberty.

The final justification, Bout's involvement with Charles Taylor years ago, may be the most disturbing.  Bout's alleged arms trafficking in this region occurred many years ago.  The civil war in Liberia, which began in 1989, ended in 2003 with the signing of the Comprehensive Peace Agreement.[30]  Likewise, the eleven-year conflict in Sierra Leone ended in 2002.[31]  Charles Taylor has been incarcerated in the Hague since 2006[32] where he has been tried for war crimes

---

[30]     *See* Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, 2010 Human Rights Report: Liberia (Apr. 8, 2011) at 1.

[31]     *See* Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, 2010 Human Rights Report: Sierra Leone (Apr. 8, 2011) at 1.

[32]     *See* United Nations Security Council Resolution 1688 (2006) (requesting the cooperation of member states to "ensure the appearance of former

before the Special Court for Sierra Leone and is currently awaiting a judgment.[33]
There is no conceivable reason that Bout's alleged connection to atrocities
committed approximately a decade ago – for which he was never convicted of any
crime – require that the BOP place him in the SHU.  Rather, the government's
reliance on Bout's connection to Charles Taylor and African conflict zones as
support for Bout's solitary confinement creates a strong inference that the BOP is
punishing Bout for conduct that was not a basis for his criminal conviction.

Under the second *Turner* factor, I consider the availability of a
feasible alternative for the prisoner to exercise the asserted right.  "Where other
avenues remain available for the exercise of the asserted right, courts should be
particularly conscious of the measure of judicial deference owed to corrections
officials . . . in gauging the validity of the regulation."[34]  This factor does not have
any particular applicability to this case because there are no alternatives, short of
release from the SHU, that would vindicate Bout's right to be free from the harsh
and excessive detention methods imposed on him.

---

President Taylor in the Netherlands for purposes of his trial by the Special Court").

[33]      *See, e.g.*, *Prosecutor v. Taylor*, Case No. SCSL-03-1-T, Decision on
Defence Motion to Re-Open Its Case in Order to Seek Admission of Panel of
Experts Report on Liberia (Feb. 9, 2012) (recently denying Taylor's motion to re-
open his case).

[34]      *Turner*, 482 U.S. at 90 (quotations and citations omitted).

Under the third *Turner* factor, I consider the impact on guards, other inmates, and prison resources.  "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials."[35] Here, the desired accommodation will have a minimal impact on guards, other inmates, and prison resources.  The desired accommodation is based on the unique facts of this case and will not create a "ripple effect" – it does not require the transfer of a category of prisoners from the SHU to general population, nor does it impact BOP's ability to place terrorists with a history of violence in the SHU.  It simply requests Bout's transfer to general population, which should not require any extra attention or resources from prison officials.  Finally, as discussed above, speculation is the sole basis for any concern that Bout's transfer to general population will have an impact on the security of guards and other inmates.

Under the fourth *Turner* factor, I consider the availability of ready alternatives for the prison to accommodate the prisoner's asserted right.  "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation."[36]  However, "if an inmate claimant can point to an alternative that fully

---

[35]    *Id.*

[36]    *Id.*

accommodates the prisoner's rights at *de minimis* cost to valid penological

interests, a court may consider that as evidence that the regulation does not satisfy

the reasonable relationship standard."[37]  Again, this factor is not applicable to the

case at hand.  There is no alternative to vindicate Bout's rights other than his

transfer to general population.  As I have previously stated, Bout's transfer to

general population does not impede any legitimate penological interest allegedly

advanced by confining him in the SHU.  In the event that Bout commits substantial

disciplinary infractions while in the general population, then there would be

grounds to reexamine the propriety of placing him in the SHU.[38]  However, the

BOP's unfounded concerns are not a sufficient basis for continuing to hold Bout in

solitary confinement.

      Considering the *Turner* factors together, I find that Bout's placement

in the SHU is not " 'reasonably related' to legitimate penological objectives" but

rather is an " 'exaggerated response' to [the BOP's] concerns."[39]  Although I

recognize that courts are loathe to interfere with questions of prison administration,

---

[37]    *Id.* at 91.

[38]    This is exactly what happened with Felip Moreno-Godoy, who was charged and convicted with identical crimes.  *See* Johnson Aff.  I note that Bout has had a nearly spotless disciplinary record during his fifteen months in the SHU.

[39]    *Turner*, 482 U.S. at 87.

an area in which the BOP is best suited to make decisions, I cannot shirk my duty under the Constitution and *Turner* to ensure that Bout's confinement is not arbitrarily and excessively harsh.[40]

## IV.   CONCLUSION

For the aforementioned reasons, Bout's request for a transfer to general population is granted.  The BOP is directed to transfer Bout forthwith.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            February 24, 2012

_____

[40]      *See, e.g., Brooks*, No. 10 Civ. 4009, Docket No. 7 at 12, 19 (noting that, while placement in the SHU would be appropriate where a prisoner "had a history of violent actions, was death-penalty eligible if convicted, and had received two disciplinary infractions," placement of this defendant in the SHU was not reasonably related to a legitimate penological objective where he had "no history of violence"); *Basciano*, 369 F. Supp. 2d at 351 ("Indefinite detention in the SHU is an exceptionally harsh method of preventing a detainee from communicating with his alleged criminal associates.").

-17-

**- Appearances -**

**For the Government:**

Guruanjan Sahni
Brendan R. McGuire
Assistant United States Attorneys
United States Attorney's Office for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2491
(212) 637-2220


**For Defendant:**

Albert Y. Dayan, Esq.
Albert Y. Dayan, Law Office
80-02 Kew Gardens Road
Suite #902
Kew Gardens, New York 11415
(718) 268-9400

Kenneth J. Kaplan, Esq.
Mayo Schreiber, Jr., Esq.
Kaplan & Katzberg
760 Third Avenue
New York, New York 10017
(212) 750-3100