UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                            :
UNITED STATES OF AMERICA                    :
                                            :
    - v. -                                  :          08 Cr. 365 (SAS)
                                            :
VIKTOR BOUT                                 :
                                            :
                    Defendant.              :
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## GOVERNMENT'S SENTENCING MEMORANDUM


PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America


ANJAN SAHNI / BRENDAN R. MCGUIRE
Assistant United States Attorneys
    - Of Counsel -

# TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

I.  Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.  The Initiation of the Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.  Smulian and Bout Meet In Russia To Discuss the FARC Deal . . . . . . . . . . . . . 5

    C.  Meetings and Conversations in Romania . . . . . . . . . . . . . . . . . . . . . . .. . . . . 5

    D.  Bout's Preparation For The Meetings In Thailand . . . . . . . . . . . . . . . . . . . . .6

    E.  Meetings In Thailand . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    F.  Proceedings in Thailand . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.  The Applicable Guidelines Range . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.  The 18 U.S.C. § 3553(a) Factors And The Appropriate Sentence . . . . . . . . . . . 12

    C.  Forfeiture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . 19

III.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                          :
UNITED STATES OF AMERICA       :
                                          :
        - v. -                         :          08 Cr. 365 (SAS)
                                          :
VIKTOR BOUT,                      :
                                          :
                Defendant.          :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

## GOVERNMENT'S SENTENCING MEMORANDUM

        The Government respectfully submits this memorandum in connection with the

sentencing of Viktor Bout, which is scheduled for April 5, 2012.  Prior to his arrest, Bout was

among the world's most successful and sophisticated arms traffickers, whose ability to transport

all manner of weapons to conflict zones in Africa was so destructive and destabilizing that he

was sanctioned by the United Nations and United States.  Undeterred by the world's reproach,

Bout remained ready, willing, and able to provide a breathtaking arsenal of weapons — including

hundreds of surface-to-air missiles, machine-guns, and sniper rifles — 10 million rounds of

ammunition, and five tons of plastic explosives to men he believed represented the FARC, a

U.S.- and E.U.-designated foreign terrorist organization.  Bout conspired to acquire and deliver

the weapons and ammunition with the specific understanding that they would be used by the

FARC to kill Americans stationed in Colombia.

        A sentence of life imprisonment, as called for by the Sentencing Guidelines, is

appropriate for several reasons.  As a matter of context, it bears noting at the outset that because

of the profound national security threat posed by the proliferation of surface-to-air missiles,

Congress requires a mandatory minimum sentence of 25 years where a defendant conspires to

sell or transfer a single weapon of this kind, irrespective of the identity of the interested purchaser. But in view of Bout's offense conduct, history, and characteristics, a sentence at the mandatory minimum is insufficient to satisfy the purposes of Section 3553(a). In sharp contrast to a defendant who agrees to supply only one or a handful of surface-to-air missiles — and to whom the 25-year mandatory minimum sentence would apply — Bout conspired to acquire and deliver *700 to 800* such missiles (saying nothing of the other weaponry he offered) to an avowed terrorist organization seeking to kill Americans. Indeed, Bout was eager to be all things for the FARC — a one-stop arms supplier, transporter, military instructor, and money launderer — roles from which he expected to reap rich cash dividends. Apart from his offense conduct, as a further reflection of his contempt for the rule of law, following his arrest in this case, Bout obstructed the judicial process in Thailand, lying under oath to a panel of Thai judges about the purpose of his visit to Bangkok in order to evade extradition.

Although Bout has often described himself as nothing more than a businessman, he was a businessman of the most dangerous order. As evidence of his sophistication and experience in the weapons trade, one need look no further than his meetings in Bangkok on March 6, 2008, where he provided advice on illegal activities ranging from money laundering through the purchase of foreign banks to the acquisition of high-end technology like weaponized drones. Bout's offers of assistance to the FARC evince an exceptional level of expertise in the illegal weapons business — expertise developed from arming some of the most violent conflict zones in recent memory, including (as proven at trial) Rwanda, Angola, and the Congo. In an era in which transnational, non-state actors pose a grave threat to international security, people like Bout — who are willing to function as a bridge between arms suppliers and organizations

2

seeking to inflict mass violence — are of particular concern. As a result, in a case of this kind, the need to promote general deterrence is especially compelling.

For all of these reasons, and as set forth below, the Government respectfully submits that a sentence of life imprisonment, as provided by the Sentencing Guidelines, is appropriate.

## I.    FACTUAL BACKGROUND

### A.    The Initiation Of The Investigation

In late 2007, the Drug Enforcement Administration (the "DEA") initiated an international sting operation against Bout.[1]  The DEA directed three confidential sources ("CSs") (two of whom posed as representatives of the FARC) to propose an illegal arms deal to Andrew Smulian, a former professional colleague of Bout's.  Upon learning of the weapons proposal from Smulian over e-mail, Bout swiftly accepted and authorized Smulian to meet with the CSs to pursue the transaction.  *See generally* PSR ¶¶ 12-14; GX 1356, 1358.[2]

---

[1]  Bout devotes much of his sentencing submission to reiterating his argument that he was vindictively and politically targeted for prosecution. Bout raised this identical claim in his second motion to dismiss the Indictment, and the Court rejected it in an opinion dated August 2, 2011. *See United States* v. *Bout*, 2011 WL 3369797, at *1-2 (S.D.N.Y. Aug. 2, 2011). As the Court explained: "Although the Government offers a perfectly acceptable reason for its decision to target Bout — that 'he constituted a threat to the United States and to the international community based on his reported history of arming some of the world's most violent and destabilizing dictators and regimes' — it need not demonstrate any 'legitimate, articulable, objective reasons' for that decision, because Bout has not rasied a rebuttable presumption of a 'realistic likelihood of vindictiveness.' Even assuming the Defense Department 'harbored genuine animus toward [Bout]' due to its embarrassment over the disclosure of its alleged dealings with him, Bout's proffer falls far short of establishing that 'he would not have been prosecuted but for the animus.'" *Id.* at *2 (internal citations omitted).

[2]  "GX" refers to a Government Exhibit admitted at trial; "Trial Tr." refers to the trial transcript; "PSR" refers to the Presentence Investigation Report; and "Br." refers to Bout's sentencing submission filed on March 28, 2012.

Having received a favorable response from Bout, on January 10 and 11, 2008, Smulian met with the three CSs — Mike Snow, Carlos, and Ricardo — in Curacao to discuss the weapons deal. (PSR ¶ 13). During these meetings, recordings of which were introduced at trial, Smulian learned that (1) Carlos and Ricardo represented the FARC (GX 204T); (2) the FARC was interested in an enormous weapons order, which included surface-to-air missiles, rocket-propelled and fragmentation grenades, AK-47s, Dragunov sniper rifles, ammunition, and spare parts; (3) the FARC sought the weapons to fight the Colombian Government, which was working with the "gringos" (GX 201T, at 18; GX 204T, at 40); and (4) the FARC would pay for these weapons with cash derived from its cocaine business. (GX 201-T, at 10). Recognizing the scope and magnitude of this arms deal, Smulian quickly appreciated that he would need to discuss its terms personally with Bout in Moscow. Thus, before leaving for Curacao, on January 13, 2008, Smulian e-mailed Bout, "Meeting here very good, and will explain when I see you." (GX 1365). Upon receiving this positive report from Smulian about the proposed arms deal, the very next day Bout directed the preparation of "multiple entry visas" for Smulian and Jon Gylfason, who had been shuttling phone and e-mail messages between Bout and Smulian regarding the deal, among other things. (GX 1366 and 1366T; *see also* GX 206A-T - 206D-T).

**B.    Smulian and Bout Meet in Russia To Discuss The FARC Deal**

While in Moscow, Smulian and Bout discussed the weapons deal both in the privacy of Bout's home and also in his office. (PSR ¶ 14). Upon hearing from Smulian about the FARC's weapons-related needs, and following Smulian's inquiry about him, Bout placed a telephone call to an individual whom Smulian understood to be Peter Mirchev, a Bulgaria-based weapons manufacturer whom Bout had introduced to Smulian at an arms exhibition in Dubai in 1997.

4

(Trial Tr. 1249). In the midst of this telephone conversation, Bout turned to Smulian and said that "a hundred pieces [are] available immediately," which Smulian took to refer to 100 Igla surface-to-air missiles. (Trial Tr. 1250). Apart from agreeing to supply the weapons requested by Carlos and Ricardo, Bout volunteered an array of additional illegal services that he could render to the FARC, including (1) a team of instructors "for training the FARC troops in bush fighting and military affairs" (Tr. 1253; GX 419T, at 2); (2) end user certificates (Trial Tr. 1252-53; GX 415T, at 2); (3) a weapons delivery system consisting of two cargo planes, crews, and 200 cargo parachutes (Trial Tr. 1254-55); and (4) advice on how to launder the FARC's drug-derived cash. (Trial Tr. 1257). Based on his own research of the FARC, Bout surmised that the terrorist organization numbered between 9,000 and 12,000 members, whose weapons needs would approximate 100 tons (Trial Tr. 1262) — in other words, a lucrative, long-term business opportunity.

### C.    Meetings and Conversations in Romania

A few days after leaving Moscow, and following a brief stop-over in Copenhagen, Smulian met with Mike, Carlos, and Ricardo in Bucharest, Romania, to continue their discussions regarding the weapons deal. (PSR ¶ 15). Over the following two weeks, it appeared that Bout would travel to Romania, but then he ultimately decided against doing so, concluding that the American presence in Romania made it an unsafe location for him. *See* GX 1002T, at 144 (Bout stating, "But I'm going to explain, uh, Romania for me is very, uh . . . it's no good. Why? It has, it has 'gringo' centers of operation. Lots of big ones."). During the same time period, however, Bout exchanged numerous phone calls and text messages with Smulian, in which the seriousness of their commitment to the weapons deal was manifestly clear. (PSR ¶

5

15).  For example, Bout repeatedly described in intercepted phone calls with Smulian that he was

taking affirmative steps in furtherance of the weapons deal with the manufacturer, whom

Smulian understood to be Peter Mirchev.  *See, e.g.*, GX 501L-T (Bout stating "And plus I had the

confirmation for what they will desperate need."); *id.* (Bout stating, "You just go to, to, to one

place I tell you, sign the papers, and that's it.  It's done.  It's friend of mine.  He said everything

is ready.").  And as the jury's verdict reflects, these intercepted calls also fatally undermined

Bout's asserted defense that he was merely stringing along the CSs in order to lure them into a

scam for two aging aircraft that he was desperate to sell.[3]

### D.    Bout's Preparation For the Meetings In Thailand

Shortly after Smulian left Romania in February 2008, Bout, who already maintained five

different e-mail accounts, created a new one (not in his own name), which he used to e-mail

Carlos to continue communicating about the weapons deal.  *See* GX 800-01; 1301A-60; 1375.

Prior to the meetings in Thailand, Bout extensively researched the FARC and its violent

objectives, including against United States interests.  To take one example that the forensic

analysis of Bout's laptop revealed, Bout viewed a violent YouTube video about the FARC's use

of deadly pipe and fire bombs, training in which it apparently had received from the Irish

Republican Army, another terrorist group.  (GX 1341-T).  (Indeed, during the March 6, 2008

---

[3]  In his sentencing submission, Bout urges the Court to reject the jury's verdict, reiterating his defense that he was "stringing the DEA operatives along with a prospect for an arms deal so that he [could] dump on them the two cargo airplanes that he had collecting dust in Congo." (Br. 8).  Bout did not contest the sufficiency of the evidence on these grounds in any of his post-trial motions, and his current challenge cannot properly be considered as a basis to "decline to sentence" him, as he requests. (Br. 1).  In any event, the Court already rejected Bout's Rule 29 motion at the close of the trial evidence (*see* Trial Tr. 1601), and Bout offers no basis to disturb that ruling.

meetings in Bangkok, Bout specifically referred to this video, praising the FARC's ingenuity in devising explosives.) In the course of researching the FARC, Bout also accessed materials that unmistakably described the FARC's virulent opposition to the United States. *See, e.g.*, GX 1310 (indictment against the FARC and certain members, which notes: "In and around March 1998, the FARC declared that U.S. citizens, who they considered to be 'military advisors,' are 'legitimate military targets.'"); GX 1331 (Department of Justice press release stating, "Since at least the early 1960s, the FARC has been violently anti-American and has worked against the interests of the United States, announcing in March 1998 that all U.S. officials are 'legitimate military targets.'").

### E.    Meetings in Thailand

On March 5, 2008, despite the existence of an international travel ban, Bout and his associate, Misha Belozerosky, took an overnight flight from Moscow to Bangkok in order to meet with Smulian, Mike, Carlos, and Ricardo about the weapons deal. The following morning, Bout participated in two meetings with the CSs at the Sofitel Hotel in Bangkok — one at the hotel mezzanine and the second in a private conference room. (PSR ¶ 16). The recording of the two meetings makes clear that Bout (1) understood that the weapons requested by the FARC would be used, among other things, to kill American pilots stationed in Colombia; and (2) was committed to providing a massive arsenal of weaponry to the FARC, well above and beyond what the CSs had requested.

First, Bout's statements at the meetings reflect his clear understanding that the FARC intended to use the weapons provided by him to kill Americans in Colombia. *See, e.g.* GX 1002T, at 88-89 (Bout stating, "That is why I have the same problems with the gringos . . . . Yes,

yes, we're together . . . . And we have the same enemy."); *id.* at 125 ("Listen.  We . . . we have a

policy, uh, . . . gringos are enemies."); *id.* at 138 (Carlos stating, "And we want to start . . . start

killing American pilots." Bout: "Yes, yes.  We're, we're going to prepare everything.").  Far

from evincing any hesitation, Bout repeatedly expressed solidarity with the FARC's interest in

using the weapons he would provide to kill American pilots stationed in Colombia.

Second, as evidence of his genuine commitment to this transaction with the FARC, Bout

volunteered additional quantities and types of weapons, as well as other illegal services, beyond

what Carlos and Ricardo had requested.  For example, it was Bout, not the CSs, who suggested a

quantity of 700-800 surface-to-air missiles.  (GX 1002T, at 90-91; GX 1200).  With respect to

AK-47s, Bout recommended a quantity of 20,000 to 30,000, well above the 5,000 that Carlos had

suggested.  (GX 1002T, at 89).  Similarly, when the CSs requested one ton of C4 explosives,

Bout countered with five times that amount.  (*Id.* at 121).  Bout even proposed weapons systems

to the CSs that they had never requested, including ZU-23 anti-aircraft cannons (*id.* at 82); night-

vision equipped sniper rifles (*id.* at 95); land mines (*id.* at 116); ultralight aircraft outfitted with

grenade launchers (*id.* at 133); and unmanned aerial vehicles (*id.* at 134).  Apart from

volunteering higher quantities and additional types of weapons, Bout also offered (1) assistance

in obtaining end user certificates through corrupt means (*id.* at 77, 88); (2) a delivery system for

air-dropping the weapons, which would include flying cover loads of flour and fruit to create the

false appearance of legality (*id.* at 106); and (3) advice on laundering the FARC's drug-derived

cash (*id.* at 43, 47).

To commence arming the FARC, Bout quoted a start-up price of $15 to $20 million to the

CSs.  (GX 1002T, at 123).  He also directed Misha, who had accompanied him to Thailand, to

travel to Spain at the end of their meetings in Bangkok to collect a € 5 million initial payment from the CSs.  At the conclusion of the meetings at the Sofitel Hotel, however, Bout and Smulian were both arrested.  (PSR ¶ 17).

**F.       Proceedings in Thailand**

In connection with the extradition proceedings in Thailand, Bout presented an extensive defense case, which included his own testimony.  Bout falsely testified that he had visited Thailand in March 2008 primarily to promote the Thai-Russia relationship.  According to Bout, Russia and Thailand had previously discussed the sale of military weapons and submarines, and he had traveled to Thailand in furtherance of those discussions.  Bout also called as a witness, Anurak Phromngam, a Royal Thai Navy official, seemingly to corroborate Bout's testimony regarding traveling to Thailand to discuss a submarine deal.

With respect to the meeting with the CSs at which he was arrested, Bout testified that: (a) he was to "meet Mr. Smulian, who would take me to meet foreign businessmen who were interested in buying aircraft"; (b) he was arrested after meeting with the "foreign businessmen" for only "15 minutes"; (c) he did not know the nationalities of the people with whom he met; (d) no one at the meeting "clearly said that they were members of the FARC.  I did not know either who was a member of the FARC.  If there were any, they should have been arrested for legal action."; and (e) "in the meeting, there was no discussion about selling weapons to the FARC." (GX 102; 1500T).

These false statements were plainly designed to obstruct the extradition proceedings in Thailand.  First, with respect to his statements about pursuing a potential submarine deal, the Director General of the Royal Thai Navy submitted a letter to the Chief Judge of the Thai

Criminal Court and to the United States Ambassador to Thailand that completely undermined Bout's claim of pursuing official business with the Royal Thai Navy, and that raised serious doubts about the testimony of Phromngam.  In a March 13, 2009 letter (a copy of which the Government previously submitted to the Court), the Director General of the Royal Thai Navy stated, in relevant part, that "the Royal Thai Navy has never had any official dealings with Mr. Viktor Bout, nor has it ever had any appointments to conduct business with him during his travel to Thailand in March 2008."  As to Bout's statements about his meetings with the CSs, the two-hour recording thoroughly exposed his testimony in the Thai extradition proceeding as false. Finally, it bears mention that despite defense counsel's vigorous insistence at trial (and now at sentencing) that Bout was merely scamming the CSs in order to sell them planes, Bout never testified to that effect during the proceedings in Thailand.

## II.    DISCUSSION

### A.    The Applicable Guidelines Range

The Government agrees with the Probation Office's analysis with respect to the applicable Guidelines' range for Bout.  Specifically, the Government agrees that Counts One through Four are grouped pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 3D1.2(b).  (PSR ¶ 21).  The Government also agrees that Count Three is the most serious count, and that therefore the Guidelines' offense level before any victim-related or role adjustments is 51.  (PSR ¶¶ 22-32).

The Government further agrees that, because the offense involved a "Federal crime of terrorism," as defined by 18 U.S.C. § 2332b(g)(5), the offense level should be increased by 12 levels. (PSR ¶ 33).[4]

Based on the foregoing, the Government agrees that Bout's total applicable Guidelines offense level is 63. (PSR ¶ 40). Because the terrorism enhancement in U.S.S.G. § 3A1.4 applies, pursuant to U.S.S.G. § 3A1.4(b), Bout's Criminal History Category is Category VI. (PSR ¶ 43). Accordingly, based on a Guidelines offense level of 63, and a Criminal History Category of VI, the Guidelines range applicable to Bout is life imprisonment. (PSR ¶ 67).

**B.    The 18 U.S.C. § 3553(a) Factors And The Appropriate Sentence**

The nature and circumstances of Bout's offenses of conviction are extraordinary. When considered alongside his history and characteristics, they fully support the imposition of a life sentence.

As an initial matter, the scope of the arms trafficking conduct of which Bout was convicted is staggering. In this case alone, Bout agreed to supply more than 20,000 AK-47s, 20,000 fragmentation grenades, 740 mortars, 350 sniper rifles, 10 million rounds of ammunition and five tons of plastic explosives to the FARC, a terrorist insurgency he believed intended to use the arms and explosives to kill Americans. This exceptional sum does not even include the

---

[4] Under 18 U.S.C. § 2332b(g)(5), a "federal crime of terrorism" is defined as an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." The evidence at trial clearly established that Bout was not only made aware of the fact that the weapons he agreed to sell were going to the FARC to kill Americans, but also that he was personally supportive of the FARC's armed campaign against the United States in Colombia. In particular, Bout's offer of trainers, weapons, and explosives — many of which the sources did not even ask for — made plain his intent to assist the FARC in retaliating against the United States.

terrorist tool that Bout believed the FARC needed most urgently: surface-to-air missiles. On that score, Bout could not have made his intentions more clear: he agreed to provide the FARC with 100 missiles immediately and 700 to 800 missiles in total. Bout provided an approximate price range for the missiles (GX 1002T, at 93), and, drawing on his past experience and skill in the arms business, explained how he could covertly deliver them to the FARC in Colombia (GX 1002T, at 100-107). Few people in the world have both the willingness and the capacity to supply a terrorist organization with one surface-to-air missile, much less hundreds of them. Viktor Bout was one of those people.

Because of the profound harm that surface-to-air missiles can cause and their lack of any legitimate private use, Congress has prescribed a mandatory minimum sentence of 25 years for any defendant convicted of knowingly participating in the unauthorized manufacture, delivery, possession, transfer, or use of a surface-to-air missile, as well as conspiring or attempting to do so. The mandatory minimum sentence applies irrespective of the quantity of missiles at issue, irrespective of the recipient of the missiles, and irrespective of the purpose for which the missiles are to be used. Judged against this framework, a 25-year mandatory minimum sentence for Bout is insufficient for a number of reasons.

First, Bout was convicted of three other terrorism offenses, including counts of conspiring to kill American nationals and American officers and employees. His sentence must reflect the fact that he was convicted of having agreed to do more than just acquiring and exporting missiles. He was also convicted of agreeing to provide the missiles to a terrorist organization, and doing so with the knowledge that the terrorist organization planned to use the missiles to kill Americans.

Second, Bout agreed to supply a remarkable quantity of missiles. After suggesting that the FARC needed reserve amounts of missiles, Bout, without any suggestion from the sources as to quantity, advised that he could provide the FARC's soldiers with 100 missiles immediately and 700 to 800 in total. (GX 1002, at 90-91).

Third, Bout agreed to provide the missiles without hesitation and with frightening speed. During his first face-to-face conversation with Smulian about the weapons deal in Moscow, right after hearing that the FARC urgently needed surface-to-air missiles, Bout made a phone call to Peter Mirchev and then told Smulian that 100 missiles were available immediately. (Trial Tr. 1250). And only six weeks later in Thailand, Bout repeated his willingness and ability to supply the FARC with 100 missiles immediately. (GX 1002T, at 91). Bout's extensive computer research on the FARC, the expertise he demonstrated in Thailand regarding the covert delivery of weapons across the world, and his willingness to send his associate, Misha, to Spain the next day to pick up the initial payment for the weapons all confirmed that Bout fully intended to supply the missiles to the FARC as soon as possible.

Fourth, Bout's own words made clear that he could supply far more than missiles. In addition to the arsenal of missiles, guns and explosives that the sources requested, Bout, without any prompting, suggested other types of weapons systems and explosives that he could supply to further the FARC's terrorist cause — unmanned aerial vehicles (essentially, drone airplanes), ultra-light airplanes outfitted with grenade launchers, ZU-23 anti-aircraft canons, and land mines. And Bout's offers to assist the FARC were not limited to weaponry. On his own, Bout suggested a variety of services that he could provide to the FARC, including (1) a team of weapons trainers; (2) end user certificates; (3) a weapons delivery system consisting of two cargo planes, crews,

and 200 cargo parachutes; and (4) advice on how to launder the FARC's drug proceeds. Bout's capacity and willingness to provide such a massive quantity of lethal weapons and such a broad array of illegal services to a terrorist group reflects a stunning level of sophistication and fluency in the arms trade, and makes the nature of his offenses truly extraordinary.

Fifth, although Bout was clearly focused on making a profit from the proposed FARC weapons deal, the Government submits that his conduct in this case was motivated by more than just greed. Upon meeting Carlos in Thailand, Bout wasted little time before sharing his views about the United States. *See, e.g.* GX 1002T, at 88-89 (Bout stating, "That is why I have the same problems with the gringos . . . . Yes, yes, we're together . . . . And we have the same enemy."); *id.* at 125 ("Listen. We . . . we have a policy, uh, . . . gringos are enemies."). And as the meetings in Thailand progressed, Bout revealed the intensity of his views. *Id.* at 126 (Bout stating, "It's not, uh, business. It's my fight. Only go . . . only hear that I'm, uh, fighting the United States . . . for ten to fifteen years." ). Bout's anti-American sentiments were genuine and not empty puffery designed to impress a potential new client. To establish the authenticity of Bout's anti-American beliefs, one need not look any further than his commitment to executing the FARC weapons deal efficiently and surreptitiously, knowing that the weapons were needed to kill Americans in Colombia. As reflected in Bout's reaction to the YouTube video about the FARC's use of pipe bombs ("Congratulations. Genius. Genius. Genius." *id.* at 112), he admired the FARC's means and methods and yearned to help them in any way he could. Bout's offers of lethal material support were not made out of greed alone, but also were informed by the mutual hatred that Bout and the FARC shared for the "same enemy" — the United States. (*Id.* at 88-89). Bout did far more than just try to sell the FARC two airplanes, as his counsel continues to claim;

14

instead, Bout actively embraced the FARC's terrorist cause, and sought to forge a productive and profitable relationship with the extremist group. (*Id.* at 160 (Bout stating, ". . . the biggest road ahead always starts with sm . . . first steps.").

The fact that the DEA arrested Bout as part of a sting operation is not a mitigating factor. The jury convicted Bout of four terrorism conspiracies, each of which Congress has determined should be subject to the same maximum sentences and advisory Guidelines' ranges as their substantive counterparts. Here, Bout demonstrated both the capacity and the willingness to put millions of dollars worth of high-powered, lethal weapons into the hands of men he believed were terrorists plotting to kill Americans. In calling for similar punishment for conspiracies to commit terrorism crimes as for substantive terrorism crimes, Congress implicitly recognized that U.S. law enforcement should not have to wait until crimes of terrorism are actually committed before investigating and arresting criminals who engage in such conduct. Transnational criminals like Bout who are ready, willing, and able to arm terrorists transform their customers from intolerant ideologues into lethal criminals who pose the gravest risk to civilized societies. The fact that the DEA identified the threat that Bout posed, and then developed overwhelming proof of his criminal intent through a sting operation before he had the chance to actually arm the FARC and kill Americans, should not be cited as a factor that somehow mitigates his sentence.

Sixth, in addition to the unique nature of the offense, Bout's history and characteristics counsel for a sentence of life imprisonment. As the evidence at trial established, the FARC deal was not the first time that Bout had agreed to arm and stoke a violent conflict. For example, in the second meeting in Bangkok, Bout told Carlos and Ricardo that he had conducted 5,000 operations from the IL-76 cargo plane, a reference to an enormous amount of prior weapons

deliveries. (GX 1002T, at 106). To take an example of some of these weapons deliveries, in discussing the FARC deal with Smulian in his study in Moscow, Bout hearkened back to his air-drops of weapons for UNITA in Angola. (Trial Tr. 1256; GX 301T, at 15). And as James Roberts and Charles Makuto testified, Bout had been on the runways in Rwanda and the Congo, personally supervising his cargo planes as they were loaded with scores of weapons, military vehicles and soldiers in furtherance of an escalating regional war. (Tr. 1508-10, 1530-35).

Contrary to defense counsel's claims at trial that the UN sanctions had forced Bout to withdraw altogether from the arms business, the evidence shows that Bout remained involved in the weapons trade even after the imposition of international sanctions. For example, at the same time that he was discussing the FARC deal with Smulian, Bout was also exploring a significant weapons transaction with the Tanzanian military. *See* GX 1360 (e-mail exchange with Gylfason regarding helicopter gunships, tanks, and "all other stuff one army needs"); GX 1208A (Bout e-mailing Gylfason about the status of the Tanzanian deal, and describing next steps with the Ministry of Finance and the "President Office").

Evidence obtained from Bout's computer further reflected his more recent involvement in the arms business, including with Libya. For example, in an instant message chat with an individual using the screen-name "think-big," occurring three days before the Bangkok meetings, Bout asked, "When you will be going to Libya"? Evincing a clear understanding of Bout's question, "think-big" replied, "today I was with the customer . . . and they have requirement for kornet," which is a guided missile system. Referring to the order for the "kornet," "think-big"

then stated, "I will get it and send it to u." Bout receptively replied, "Waw will take care about it."[5]

Seventh, a full evaluation of Bout's history and characteristics must also consider how he sought to corrupt his extradition proceedings in Thailand. Simply put, he repeatedly lied in an attempt to avoid extradition. While under oath before a panel of judges in Bangkok, Bout falsely stated, among other things, that the meetings at the hotel lasted for 15 minutes, were with "foreign businessmen," and that no one clearly said that they were members of the FARC. (GX 102; 1500T). He even testified that "there was no discussion about selling weapons to the FARC" at the meeting. (*Id.*). At the conclusion of his testimony, Bout signed and submitted a written summary of his testimony knowing that it contained material false statements. And following consideration of Bout's materially false statements, as well as all of the other evidence presented, the trial court ruled in Bout's favor and denied the United States' request for extradition. The fact that the court's ruling was subsequently reversed on appeal in no way diminishes the significance of Bout's lies. Bout's perjurious and self-serving testimony reveals a profound lack of respect for the law and a willingness to subvert the judicial process to avoid prosecution.

---

[5] In advance of trial, the Court denied the Government's application to admit this instant message chat pursuant to Rule 404(b) because "think-big" was unidentified and because Bout's statements in the chat were not sufficiently clear. Even if the evidence was inadmissible before a jury under Rule 403, the Government respectfully submits that it should be considered for purposes of sentencing, as it undermines Bout's assertion that he had withdrawn from the arms business. For the same reasons, Bout's e-mail communications with Mirchev from 2007 — which included Mirchev's request for Bout's assistance in obtaining equipment for a Russian infantry combat vehicle, as well as a reference to a $38 million weapons transaction, the invoice of which was dated August 2007 — may also be considered to refute Bout's suggestion that he was no longer "interested and/or not able to engage in the business of arms." (Br. 8).

Finally, in determining an appropriate sentence for Bout, it is instructive to compare his conduct and history to the three defendants in *United States* v. *al Kassar, et al.*, which is the most analogous case to Bout's. Al Kassar, the lead defendant in that case, was sentenced to 30 years' imprisonment, while Godoy and al Ghazi, who were less culpable, were each sentenced to 25 years (the mandatory minimum). The minimum sentences for Godoy and al Ghazi reflected the fact that both men played supporting roles to al Kassar, who (like Bout) personally negotiated the logistics and the prices for the weapons deal with the CSs and the weapons suppliers.

The sentences in *al Kassar* are a relevant point of comparison for a number of reasons. First, it would be an anomalous outcome for Bout to receive the same sentence (25 years) as Godoy and al Ghazi; Bout's offense conduct, history, and characteristics are substantially more culpable than theirs. Indeed, Bout's documented history as a weapons-trafficker and national security threat are more significant than al Kassar's, as evidenced by the absence of UN or U.S. sanctions against al Kassar. Second, the quantity and scale of weapons and other illegal services that Bout agreed to supply to the FARC simply dwarfs what al Kassar, Godoy, and al Ghazi offered in that case. And third, al Kassar was 63 years-old at the time of his sentencing, 18 years older than Bout is today. Although Judge Rakoff could not impose a sentence of life imprisonment because of extradition-related assurances that the United States had made to Spain, a sentence of 30 years for al Kassar closely approximated a life sentence. In view of these circumstances, and in the interest of avoiding unwarranted disparities, the sentences imposed in *al Kassar* counsel in favor of a life sentence for Bout.

### C.    Forfeiture

Along with this memorandum, the Government respectfully submits the enclosed proposed Order of Forfeiture.  The forfeiture statute pertaining to terrorism offenses, 18 U.S.C. § 981, which was noticed in the Indictment in this case, provides that the following interests, among others, are subject to mandatory forfeiture:

> (G)  All assets, foreign or domestic—
>
> (iii)  derived from, involved in, or used or intended to be used to commit any Federal crime of terrorism (as defined in section 2332(b)(5)) against the United States, citizens, or residents of the United States, or their property . . . .

18 U.S.C. § 981(a)(1)(G)(iii).

Because Bout was convicted of a "Federal crime of terrorism (as defined in section 2332b(g)(5)) against the United States, citizens, or residents of the United States, or their property," the Government seeks the entry of a money judgment against Bout for an amount that represents the assets "intended to be used to commit" the terrorism offenses.[6]

During the course of the March 6, 2008 meetings in Thailand, Bout agreed to supply various quantities of weapons to the FARC for the purpose of killing Americans in Colombia, and for certain weapons, he quoted prices.  For example, with respect to the surface-to-air missiles, Bout agreed to supply a quantity of 700 to 800 at a price of between $120,000 to $180,000 per missile.  (GX 1002T, at 90-93).  Therefore, based on a conservative estimate of the

---

[6]  Notably, the Government is not seeking the forfeiture of all of Bout's foreign and domestic assets (irrespective of their nexus to the charged offenses), which is permitted under 18 U.S.C. § 981(a)(1)(G)(i) and was ordered in the *al Kassar* case. *See United States* v. *al Kassar*, Preliminary Order of Forfeiture, filed February 26, 2009 (ordering, *inter alia*, the forfeiture of all of the defendant's assets, foreign and domestic, including three foreign bank accounts controlled by the defendant and an estate located in Spain where the defendant resided).

quantity (700) and the price ($120,000), the total cost for the surface-to-air missiles that Bout

intended to use in connection with the charged offenses was $84 million.  And that sum does not

even include the remainder of the weaponry that Bout agreed to provide.  (GX 1200).  Rather

than seeking forfeiture of $84 million, however, the Government requests a money judgement

against Bout in the amount of $20 million, which represents the payment that Bout requested to

initiate the FARC weapons deal.  (*Id.* at 123) (Carlos: "How much . . . money do you need to

start moving?" Bout: "I have to do a bit of pre...[U/I] of the bank.  Analyze.  At least fifteen,

twenty million.  I don't know.  But to do the job quickly. . . .").

## III.    CONCLUSION

Based on the foregoing, and consistent with the Sentencing Guidelines, the Government

respectfully submits that a sentence of life imprisonment is appropriate to comply with the

purposes of sentencing outlined in 18 U.S.C. § 3553(a).

Dated: March 30, 2012

Respectfully submitted,

PREET BHARARA
United States Attorney

By:    _Anjan Sahni/Brendan R. McGuire_

Anjan Sahni/Brendan R. McGuire
Assistant United States Attorneys
(212) 637-2491/2220

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on the following by ECF on March 30, 2012:

Albert Dayan, Esq.
80-02 Kew Gardens Road, Suite 902
Kew Gardens, New York 11415

Kenneth J. Kaplan, Esq.
Mayo Schreiber, Jr., Esq.
767 Third Avenue
New York, New York 10017

Brendan R. McGuire