**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

United States,

             Plaintiff

vs.                              08-cr-365

Viktor Bout,

             Defendant.

_____

**MEMORANDUM IN SUPPORT**
**OF DEFENDANT'S MOTION FOR NEW TRIAL**
**BASED ON NEWLY DISCOVERED EVIDENCE**

**Alexey V. Tarasov, Esq.,**
**Attorney at Law**

**723 Main Street, Suite 310**
**Houston, Texas 77002**

**Tel.: 832-623-6250**
**Fax: 832-495-4168**

# TABLE OF CONTENT

**PROCEDURAL HISTORY** ..................................................................................... 1

**ARGUMENT** ......................................................................................................... 2

    **I.**    AFTER A HEARING, BOUT'S CONVICTION SHOULD BE SET ASIDE BECAUSE SMULIAN APPARENTLY HAD KNOWLEDGE OF THE OPERATION AGAINST BOUT BEFORE THE MEETING IN BANGKOK, AND THERE WAS NO SHARED INTENT BETWEEN THE PARTIES TO A PURPORTED CONSPIRACY. ......................................................................................... 2

    **A.**   **Newly obtained materials from Smulian's laptop computer show that Snow solicited Smulian to take part in law enforcement operations prior to the DEA's sting targeting Bout.** ..................................................................................... 2

    **B.**   **A juxtaposition of the representations the undersigned received in the course of gathering the evidence to the effect that Snow was working as an agent for MI6 at the same time that he was a DEA source and the documents recovered from Smulian's laptop makes an inference of Smulian's knowledge of Snow's employment in a law-enforcement capacity more probable.** ................................................................ 4

    **C.**   **A statement made by one of the DEA agents as part of a documentary film puts into focus Smulian's role as a covert operative.** ........................................... 5

    **D.**   **Newly-received Thai immigration records show that within mere hours of Smulian's arrest in Bangkok on terrorism charges, the U.S. agents allowed him to fly out of the country, apparently with minimal physical restraints.** ................................ 6

    **E.**   **A fax sent from Smulian's spouse residing in Africa to Bout's former Moscow-based attorney asking for a million-dollar cash payment for a change in testimony reflects Smulian's double-dealing nature.** ..................................................... 7

    **F.**   **The evidence presented warrants a new trial.** ........................................ 8

        **(1)**    **The evidence of Smulian's involvement in the investigation in an undercover capacity is newly discovered, such that it could not have been obtained by trial counsel.** ............................................................................................... 9

        **(2)**    **The evidence presented is material within the meaning of case law interpreting Fed. R. Crim. P. 33. The evidence is not cumulative.** ........................... 10

        **(3)**    **Smulian's role as a Government informant would have led to a different verdict.** ............................................................................................... 11

II.     NEWLY DISCOVERED INVOLVEMENT OF THE U.S. ATTORNEY'S OFFICE IN
PERSUADING THIS COURT TO EXCISE ITS ADVERSE CREDIBILITY FINDINGS WARRANTS A
HEARING AS TO THE CIRCUMSTANCES LEADING UP TO THE COURT'S WITHDRAWAL OF ITS
CREDIBILITY DETERMINATIONS AND THE PROSECUTOR'S DISCHARGING THE DUTY TO
INFORM THE COURT OF MISLEADING TESTIMONY BEFORE THE GRAND JURY. ................... 12

   A.   After a hearing, the Court should order a retrial because newly discovered critical
   evidence not only tends to impeach the Government's account of the whole operation,
   but also potentially undermines the integrity of grand jury proceedings in
   Bout's case. ............................................................................................... 12

      (1)    On a claim of Government misconduct or negligence in permitting non-
      credible testimony to stand uncorrected before the jury, a legal standard that is
      different from the one used in conventional "new evidence" Rule 33 motions should
      be applied. ........................................................................................... 16

      (2)    The evidence presented is adequate Rule 33 evidence for purposes of this
      proceeding. .......................................................................................... 17

      (3)    Dismissal of the indictment would be an appropriate remedy if the agent
      giving material testimony to the jury was found adversely credible before jeopardy
      had attached. ....................................................................................... 19

      (4)    It is of no legal significance whether or not Bout's counsel was privy to the
      discussion between the Government and the Court. ................................... 21

   B.   A hearing is warranted as to the propriety of the Government's involvement in
   getting the adverse credibility finding withdrawn. ........................................ 22

III.    NEW TRIAL SHOULD BE ORDERED BECAUSE THE EVIDENCE SHOWS THAT SMULIAN
MISLED THE JURY WHEN HE TESTIFIED THAT BOUT CALLED A BULGARIAN ARMS
SUPPLIER FOR SURFACE-TO-AIR MISSILES. ............................................. 22

   A.   Newly discovered evidence shows that Bout did not consider Smulian's offer of an
   arms deal seriously because he never made any calls to Peter Mirchev. ............ 22

      (1)    Mirchev's declaration shows that Bout never treated seriously the deal with
      the alleged FARC members. ................................................................ 22

      (2)    The evidence presented is in fact newly discovered. ......................... 23

   B.   The outcome would have been different, had the evidence been presented. .......... 24

CONCLUSION ......................................................................................... 24

# TABLE OF AUTHORITIES

**U.S. Supreme Court decisions**

*Bank of Nova Scotia v. United States*,
487 U.S. 250 (1988). ........................................................................................... 20, 21

*United States v. Hasting*,
461 U.S. 499 (1983). ........................................................................................... 20

*United States v. Mechanik*,
475 U.S. 66 (1986). ............................................................................................ 20

*United States v. Williams*,
504 U.S. 36 (1992). ............................................................................................ 20

**Decisions of federal courts**

*United States v. Alessi*,
638 F.2d 466 (2d Cir. 1980). .............................................................................. 8

*United States v. Basurto*,
497 F.2d 781 (9th Cir. 1974). ............................................................................. 17

*United States v. Bonanno*,
430 F.2d 1060 (2d Cir. 1970). ............................................................................ 10

*United States v. Consolidated Laundries Corp.*,
291 F.2d 563 (2d Cir. 1961). ............................................................................. 19

*United States v. Ferguson*,
246 F.3d 129 (2d Cir. 2001). ............................................................................. 8

*United States v. Goldman*,
451 F.Supp. 518 (S.D.N.Y. 1978). .................................................................... 17, 18, 19

*United States v. Guillette*,
547 F.2d 743 (2d Cir. 1976). ............................................................................. 16, 17

*United States v. Josephberg*,
562 F.3d 478 (2d Cir. 2009). ............................................................................. 17

*United States v. Miller*,
411 F.2d 825 (2d Cir. 1969). ............................................................................. 19

*United States v. Nash*,
    338 Fed.Appx. 96 (2d Cir. 2009). ......................................................................  17

*United States v. Owen*,
    500 F.3d 83 (2d Cir. 2007). ...........................................................................  8

*United States v. Polouizzi*,
    564 F.3d 142 (2d Cir. 2009). ..........................................................................  8

**Federal statutes**

18 U.S.C. § 1114. ............................................................................................  1

18 U.S.C. § 1622. ............................................................................................  20

18 U.S.C. § 1623. ............................................................................................  20

18 U.S.C. § 2332. ............................................................................................  1

18 U.S.C. § 2332g. ..........................................................................................  1

18 U.S.C. § 2339B. ..........................................................................................  1

18 U.S.C. § 2515. ............................................................................................  20

18 U.S.C. § 6002. ............................................................................................  20

18 U.S.C. § 6003. ............................................................................................  20

**Federal rules**

Fed. R. Crim. P. 33. .........................................................................................  passim

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

United States,

      Plaintiff

vs.

Viktor Bout,

      Defendant.

---

08-cr-365

**MEMORANDUM IN SUPPORT**
**OF DEFENDANT'S MOTION**
**FOR NEW TRIAL BASED ON**
**NEWLY DISCOVERED EVIDENCE**

      **NOW INTO COURT** comes defendant Viktor Bout, by and through his undersigned counsel, and pursuant to Federal Rule of Criminal Procedure 33 hereby submits this Memorandum in Support of Defendant's Motion for New Trial Based on Newly Discovered Evidence. As grounds for granting this motion, the defendant would show the following:

### PROCEDURAL HISTORY

      On November 2, 2011, Viktor Bout was convicted of offenses under 18 U.S.C. § 2339B (conspiracy to provide material support to a designated foreign terrorist organizations), 18 U.S.C. § 2332g (conspiracy to provide missile systems designed to destroy aircraft), 18 U.S.C. § 2332 (conspiracy to kill United States nationals, while such nationals are outside the U.S.), and 18 U.S.C. § 1114 (conspiracy to kill officers and employees of the United States). The only individual with whom Bout was alleged to have conspired for purposes of these convictions was his former business associate Andrew Smulian. Following his conviction, Bout, through counsel Albert Dayan, moved to set aside the verdict. That motion was denied. On April 5, 2012, Bout

was sentenced by this Court to 25 years of imprisonment, which was the minimum sentence permissible under the statutes of conviction.[1]

An appeal was filed with the Second Circuit Court of Appeals. The appeals court in substance affirmed this Court's decision on September 27, 2013. A petition for rehearing *en banc* was then filed, but the attorney handling the case withdrew it on November 7, 2013. Bout did not seek a writ of *certiorari* from the U.S. Supreme Court.

Based on applications from newly retained counsel, this Court extended the timeframe within which a motion for new trial under Rule 33 of the Federal Rules of Criminal Procedure may be filed from November 3, 2014 until June 1, 2015. With the foregoing filing, Bout moves for a new trial based upon the discovery of new evidence pursuant to Rule 33. Fed. R. Crim. P. 33.

## ARGUMENT

### I. AFTER A HEARING, BOUT'S CONVICTION SHOULD BE SET ASIDE BECAUSE SMULIAN APPARENTLY HAD KNOWLEDGE OF THE OPERATION AGAINST BOUT BEFORE THE MEETING IN BANGKOK, AND THERE WAS NO SHARED INTENT BETWEEN THE PARTIES TO A PURPORTED CONSPIRACY.

#### A. Newly obtained materials from Smulian's laptop computer show that Snow solicited Smulian to take part in law enforcement operations prior to the DEA's sting targeting Bout.

Documents recovered from Smulian's portable computer provide evidence that Smulian had earlier been solicited to participate in law enforcement operations by Mike Snow, the supposed DEA conduit to Smulian. While in Moscow, a member of Bout's defense team interviewed Mikhail Belozersky, Bout's security assistant who was with him in Thailand. During

---

[1] The 25-year sentence was imposed for Bout's violation of 18 U.S.C. § 2332g. Sentences on other counts were set to run concurrently.

the course of the interview in Moscow, Belozersky indicated that sometime after Bout's arrest in

Bangkok, he came into possession of an old laptop computer that once belonged to Smulian.

Approximately two gigabytes of data from Smulian's laptop computer have since been restored,

copied, and an archive containing the materials has been transmitted to Bout's defense counsel.[2]

One particular piece of electronic correspondence found on Smulian's computer is a 2005 e-mail

from Snow to Smulian, where Snow offers Smulian to become involved in a law enforcement

operation for a salary of $19,000.00 per month. *See* Exhibit "C." Snow's job offer apparently

involved looking after an operations center radio room and coordinating resupply missions for a

25-man police operation.[3] *Id.* While not directly related to the operation against Viktor Bout, the

e-mail shows that Snow approached Smulian in the past and offered him work in a law

enforcement field. The e-mail also sheds light on the relationship Smulian had with Snow in the

sense that Snow submitted job offers to Smulian. The message is also important in that it shows

that Snow offered Smulian to participate in a law enforcement operation, not in an operation

aimed at breaking the law. A reasonable inference may then be drawn to the effect that Smulian

expected that the job offers Snow sent his way would be legitimate job offers directed at securing

law and order. The existence of this type of a relationship between Snow and Smulian

undermines the theory advanced at trial to the effect that Snow offered Smulian to take part in an

illegal arms deal that would entail supplying entire armies of hostile combatants.

    As to the authenticity of the e-mail in question and the chain of custody of Smulian's

laptop, the undersigned submits that Belozersky's IT expert would be able to provide a firsthand

account of the processes utilized to recover the data from Smulian's laptop and the nature of the

---

[2] Counsel's information is such that Belozersky retrieved the laptop during a trip to Tanzania in 2009. Counsel has also been told that the laptop arrived in Moscow in a bad condition, and files had to be recovered or "un-deleted" for Belozersky's IT expert to conduct an examination.

[3] The job offer was consistent with Smulian's skills as an expert in aviation, as it involved radio communications and logistics, which were tasks Smulian was well familiar with.

documents originally recovered from it at a hearing on the foregoing motion. In addition to testifying about the forensic review of Smulian's laptop, Belozersky's IT specialist would be able to supply chain-of-custody evidence with respect to the computer. Counsel notes that the files recovered from the laptop had only recently been provided to the defense by individuals associated with Belozersky, and the undersigned has only in the recent few days begun the process of reviewing the documents. Defense counsel request leave to supplement the evidence recovered from Smulian's laptop as the review of the materials it contains progresses.[4]

> **B. A juxtaposition of the representations the undersigned received in the course of gathering the evidence to the effect that Snow was working as an agent for MI6 at the same time that he was a DEA source and the documents recovered from Smulian's laptop makes an inference of Smulian's knowledge of Snow's employment in a law-enforcement capacity more probable.**

In the course of conducting an overseas investigation of Bout's matter, the undersigned came across a source who indicated that an undisclosed group of persons were in possession of restricted intelligence documents and e-mail communications authored by Mike Snow as part of his work for the British intelligence agency MI6.[5] *See* Exhibit "D" at ¶5. The undersigned was told that the documents exposed Snow's work as an agent for both the DEA and MI6. *See id.* The undersigned was told that the documents and the e-mails essentially constituted reports by Snow to his British handlers as to the progress of the sting operation against Bout, for which Snow had been recruited by the DEA. *See id.* at ¶6. The collection of documents was latter offered for sale to Bout's wife Alla Bout. *See id.* at ¶8.

---

[4] At this time, defense counsel are in receipt of the files from Smulian's laptop that have been transmitted via a cloud storage service from Russia. Defense counsel intend to bring the laptop's content into the United States and to retain a forensic analyst to see if any relevant information can be recovered from the partition beyond that which has been to this day recovered by Belozersky's IT specialist. Defense counsel would be willing to provide a copy of the files to the Government.

[5] The fact that the British intelligence service SIS, or MI6 as it is popularly known, would take interest in the Bout matter may find explanation in the fact that Smulian was a British citizen.

After the undersigned did not succeed in the attempt to authenticate the legitimacy of the documents without exchanging any payment for them and after addressing the matter with the U.S. Attorney's Office, the undersigned recommended to Alla Bout not to pay for the documents. *See id.*

Later on, in examining the files from Smulian's laptop, the undersigned discovered a seven-page document containing the history of MI6. *See* Exhibit "E." While no MI6 reports or letters generated by Snow are tendered to this Court at this time, the undersigned nevertheless submits that the fact that the files recovered from Smulian's laptop computer suggest that Smulian did research on the history of MI6 gives rise to an inference that Smulian was likely aware of Snow's employment for British intelligence services. Smulian's knowledge to the effect that Snow was working for an intelligence service would make it all the more improbable that Snow would offer to Smulian and that Smulian would then agree to participate in an operation aimed at breaking the law.

### C.  A statement made by one of the DEA agents as part of a documentary film puts into focus Smulian's role as a covert operative.

A statement of a DEA agent given as part of a documentary interview contradicts the Government's claim during trial and provides evidence that Smulian was working in an undercover capacity at the time of Bout's arrest. In 2014, filmmakers Tony Gerber and Maxim Pozdorovkin directed a documentary film titled *The Notorious Mr. Bout*, which featured an account of Bout's life, interspersed with recorded interviews of some of the most important figures in the defense and prosecution of Bout, as well as with arms trafficking experts. *See* Exhibit "A." The film features Agent William Brown saying that "[the DEA] believed that Andrew (referring to Andrew Smulian) would be a willing partner in this scenario." *See id.* at 36:50. Prior to that, the agent says, "We tried to find an individual that can lead us to Viktor

Bout, that had operated with Bout in the past. And that penetration point to us was Andrew Smulian." *See id.* at 36:26. The Oxford English Dictionary defines "willing" as "ready, eager, or prepared to do something." Oxford Dictionary, "willing" (last visited 4/29/2015). It defines "partner" as "a person who takes part in an undertaking with another or others, especially in a business or company with shared risks and profits." Oxford Dictionary, "partner" (last visited 4/29/2015). The DEA agent's reference to Smulian as a "willing partner" and a "penetration point [to Bout]" leads to the conclusion that Smulian was cooperating with the DEA long before he and Bout were arrested at the Bangkok Sofitel. Remarkably, the agent does not say that Mike Snow, the supposed DEA conduit to Smulian, was a "penetration point" to Bout or a "willing partner."

>    **D.  Newly-received Thai immigration records show that within mere hours of Smulian's arrest in Bangkok on terrorism charges, the U.S. agents allowed him to fly out of the country, apparently with minimal physical restraints.**

Thai immigration records presented in connection with this submission reflect that Smulian left Bangkok on March 6, 2008 at 22:56, local time. *See* Exhibit "B." In view of the fact that Bout and Smulian were arrested at around 11:00 A.M. on that same day, it should strike any reasonable factfinder as odd that federal DEA agents in the space of less than 12 hours would establish the degree of trust with a terrorism suspect potentially facing a life sentence to allow him to sit unaccompanied in a different section on a commercial flight. (Tr. 1318). Against the backdrop of other evidence that made it into the record at trial, it strains credulity to believe that the U.S. agents and their Thai counterparts needed less than one half of a day to process Smulian following his arrest, interview him in connection with a major terrorism investigation, get him to cooperate to the point where the DEA felt comfortable placing a terrorist offender in the economy class cabin of a U.S.-bound airliner, and then take him to the airport. What weakens the claim that Smulian agreed to cooperate with the DEA after his arrest even more is the fact that he

came to Thailand with an outbound one-way ticket to the United States, ready to fly into the very federal district where prosecutors had already lodged a criminal complaint against him. (Tr. 1457). The sheer convenience of Smulian's having a pre-purchased ticket for departing Bangkok in the evening hours of March 6 – which left him just enough time following his own arrest earlier that day to make a deal with the Government – significantly undermines Smulian's testimony. The report of DEA Agent Zachariasiewicz as to the events of March 6 further lends corroboration to the Government's going easy on Smulian. In effect, Agent Zachariasiewicz writes that Smulian was simply "permitted to leave" after he was detained. *See* Exhibit "N."

**E. A fax sent from Smulian's spouse residing in Africa to Bout's former Moscow-based attorney asking for a million-dollar cash payment for a change in testimony reflects Smulian's double-dealing nature.**

The evidence of attempted extortion by Smulian's wife of Bout's family immediately after the arrest shows that Smulian was very much capable of changing his story. Newly discovered evidence demonstrates that Smulian's wife Cheryl attempted to extort one million dollars from Bout's family following the arrest. On May 13, 2008, the wife of Smulian sent a fax from a South African number 011-427-1109 to a law firm in Moscow that used to represent Bout in international matters. *See* Exhibit "F." The fax was addressed to an attorney named Yan Dasgupta, who, unfortunately, passed away after receiving the facsimile communication without passing it on to the family. Because of the lawyer's death, the fax was not discovered by the Bout family until after trial. *See* Exhibit "G."

The substance of the fax is that Cheryl Smulian asked the Bout family to pay her seven hundred thousand dollars in living expenses and three hundred thousand dollars in travel money so that her husband would not "let [Bout] down or even breath a word about [Bout]." *See* Exhibit "F." Smulian's wife promised this "if and only if [Bout's family] take[s] care of [her] and [her] kids." *Id.* Earlier, the author of the fax emphasized that "Andrew discussed everything with [her]

about the business and assured [her] that [Bout's family] would take care of [her] financial situation." *Id.* The letter concluded with an exclamation: "Victor [sic] I will never let you down. Trust me!" *Id.*

For purposes of the instant new trial motion, the letter is significant in two ways: first, it shows that Smulian informed his wife as to what was really going on with the operation; second, the fax makes it known that Smulian would change his story in a heartbeat if only Bout's relatives pay his wife a million dollars.

### F. The evidence presented warrants a new trial.

In line with Rule 33 of the Federal Rules of Criminal Procedure, a court may vacate any judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33. Rule 33 "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Polouizzi*, 564 F.3d 142, 159 (2d Cir. 2009) (internal quotation marks and citation omitted). The court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation," and be satisfied that "competent, satisfactory[,] and sufficient evidence in the record supports the jury's verdict." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks and citation omitted).

The Second Circuit has held that in order for a motion for new trial based on newly discovered evidence pursuant to Rule 33 to be granted, a defendant must show: (1) that the evidence could not, with due diligence, have been discovered before or during the trial; (2) that the evidence is material; (3) that the evidence is not merely cumulative; and (4) that the admission of the evidence would probably lead to an acquittal. *United States v. Owen*, 500 F.3d 83, 87 (2d Cir. 2007) (citing *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir. 1980)).

**(1)  The evidence of Smulian's involvement in the investigation in an undercover capacity is newly discovered, such that it could not have been obtained by trial counsel.**

The evidence is in fact newly discovered and was not known to the defendant at the time of trial. The evidence could not have been discovered prior to or during the trial with due diligence. Bout and his new counsel became aware of the evidence only after the trial proceedings, with the first hint supplied in the statement that Agent Brown made as part of the 2014 documentary film. In fact, Smulian testified at trial and was extensively cross-examined by Bout's attorney. He made no mention of his involvement with the DEA or his knowledge of the operation prior to the arrest in Bangkok. Notwithstanding Smulian's testimony at trial, the Government solely controlled access to the information and evidence relative to Smulian's covert engagement. Bout, or his trial attorney, could not have discovered the evidence through the exercise of due diligence any sooner. The documentary film featuring the interviews with the agents had not been released before 2014.

The e-mail and the MI6 history recovered from Smulian's laptop computer were not available to trial counsel, as Smulian's computer had been recovered by Belozersky in Tanzania and then kept in Moscow. Belozersky had been reluctant to produce the materials recovered from the laptop to Bout's family. Bout's family received a copy of the files from the laptop only recently. It was not until four days before the new trial motion was due for filing that the undersigned received the files from Smulian's computer.[6] In all, the evidence could not have been discovered prior to or during the trial with due diligence.

Thai immigration records constitute newly discovered evidence because they show that Smulian left Bangkok the same day of the arrest, as opposed to the day following it, which was

---

[6] While the undersigned has conducted a cursory review of Smulian's files, the entire volume of data has not been thoroughly examined, and its analysis is ongoing.

his testimony at trial. (Tr. 1456). While the facts relative to Smulian's leaving the country on a pre-purchased ticket and his flying in a different section of the aircraft from where the DEA agents were sitting were touched upon at trial, Bout's defense team did not raise the argument to the effect that Smulian was a covert operative before this Court. Though not newly discovered, this evidence should now be viewed in a different light.

In similar vein, Cheryl Smulian's facsimile transmission to Bout's former attorney is newly discovered, as it laid dormant in a Moscow law office for years because the attorney who handled Bout's affairs at the firm died. It was not until after the trial, when the undersigned was retained to handle Bout's matter, that Bout's spouse picked up the binders from the law firm of the deceased attorney and discovered the facsimile transmission. *See* Exhibit "G."[7]

### (2) The evidence presented is material within the meaning of case law interpreting Fed. R. Crim. P. 33. The evidence is not cumulative.

The extent of Smulian's cooperation with the DEA obviously constituted a material matter, as all of the offenses with which Bout was charged were conspiracies between him and Smulian. The newly discovered evidence in the form of Snow's job offer to Smulian, the MI6 history, the documentary film excerpt, Smulian's immigration records, and Cheryl Smulian's fax are not cumulative, insofar as they go directly to the central issue in the case: whether or not Smulian was a covert informant, a conspiracy offense with whom was impossible. On a motion for a new trial grounded in newly discovered evidence, which was known (or should have been known) to the Government at the time of trial but not disclosed, the materiality of evidence to the defendant is measured by the effect of its suppression upon trial preparation, rather than on its predicted effect on the verdict. *United States v. Bonanno*, 430 F.2d 1060, 1063 (2d Cir.), cert.

---

[7] Alla Bout represented to the undersigned that nobody from the law office of the deceased attorney contacted her about picking up the binders after the attorney's death. Ms. Bout would be prepared to testify at a hearing on the foregoing motion as to the circumstances leading up to the discovery of the fax from Cheryl Smulian.

denied, 400 U.S. 964 (1970). Without the evidence of Smulian's knowledge of the operation or his cooperation with the DEA prior to his arrest, Bout's trial attorney was virtually crippled in his ability to organize and mount an effective defense.

### (3) Smulian's role as a Government informant would have led to a different verdict.

In the event of a new trial, the new information and evidence now presented is most certain to lead to a different outcome, as no conspiracy is possible with a Government operative. Agent Brown's statement in the documentary to the effect that Smulian was a "willing partner" and a "penetration point" speak for themselves. Notably, Agent Brown does not say that the DEA's "willing partner" was Mike Snow. The plain meaning of the words show that Smulian cooperated with law-enforcement agents in getting Bout enticed into the DEA's plot.

If Smulian and Snow had a history where Snow offered Smulian various high-paying jobs with law enforcement agencies, then a conclusion to the effect that Smulian jumped at the opportunity to commit a terrorism offense offered to him by Snow would be simply improbable. Snow's soliciting Smulian to break the law and commit an international crime would be all the more unlikely if one assumes that Smulian was knowledgeable about Snow's association with MI6, an intelligence agency that strives to secure peace and avert terrorist attacks on Western nations.

There are also many questions presented by Smulian's leaving Thailand in less than 12 hours following the arrest that cast doubt on his status as a *bona fide* criminal defendant. For one, Smulian flew from Bangkok to New York on a pre-purchased ticket and apparently without safeguards, in an altogether different section of the aircraft from where the DEA agents were sitting. (Tr. 1318). The security concerns of allowing an individual arrested for a terrorism offense that carries a penalty of life imprisonment to sit unsupervised (or with limited

supervision) on an 18-hour commercial flight in an airplane are tremendous. While the testimony at trial showed that Smulian agreed to cooperate with the DEA after his arrest in Thailand, the agents' allowing Smulian to sit alone on a scheduled international flight reflects their outmost confidence in his loyalty to the prosecution, which would be next to impossible to establish in the space of mere hours that passed from the time of the arrest.

Last but not least, the Court should take note for purposes of the foregoing motion that Smulian's ultimate sentence – which not only represented a departure from the Sentencing Guidelines, but also was five times below the statutory minimum – underscores the kind of special treatment he received from the Government.

Altogether, after a hearing, Bout's conviction should be set aside on the defendant's showing of Smulian's knowing participation in the sting operation because a conspiracy cannot exist if one party to the agreement is a covert operative. The undersigned requests a hearing on the issue relative to Smulian's status as an informant to develop the record more fully and to examine the agents and the sources involved in the sting operation.

## II. NEWLY DISCOVERED INVOLVEMENT OF THE U.S. ATTORNEY'S OFFICE IN PERSUADING THIS COURT TO EXCISE ITS ADVERSE CREDIBILITY FINDINGS WARRANTS A HEARING AS TO THE CIRCUMSTANCES LEADING UP TO THE COURT'S WITHDRAWAL OF ITS CREDIBILITY DETERMINATIONS AND THE PROSECUTOR'S DISCHARGING THE DUTY TO INFORM THE COURT OF MISLEADING TESTIMONY BEFORE THE GRAND JURY.

### A. After a hearing, the Court should order a retrial because newly discovered critical evidence not only tends to impeach the Government's account of the whole operation, but also potentially undermines the integrity of grand jury proceedings in Bout's case.

New trial is warranted in Bout's case because the Government likely neglected to inform this Court that its adverse credibility ruling relative to two DEA witnesses cast doubt on the validity of the indictment. What happened in this case is that the DEA agents questioned Bout

almost immediately after his arrest in Bangkok on March 6, 2008. *See* Exhibit "N." As part of

the questioning, Bout gave the agents what arguably was tantamount to a post-arrest confession:

"[I]f everything is recorded than you have everything – you have all the cards on the table." *Id.*

More than a month later, on April 24, 2008, a grand jury sitting in the Southern District of New

York indicted Bout on the charges that ultimately led to his conviction. It appears that one of

Bout's arresting DEA agents, namely Agent Zachariasiewicz, was among the witnesses to testify

before the grand jury for the Government to procure the indictment against Bout following his

arrest in Thailand. As part of extradition hearings in the Thai lower court on September 22, 2008,

Agent Zachariasiewicz apparently stated that he testified as a witness in the U.S. court proceeding[8],

which could only mean that he appeared before the grand jury. *See* Exhibit "K." Considering the

fact that Bout's grand jury returned an indictment after Bout's arrest in Bangkok, one would be

justified in concluding that Agent Zachariasiewicz testified before the grand jury as to the events

surrounding the arrest of Bout in Thailand. The Court's decision of August 24, 2011 gave no

credence to Agent Zachariasiewicz's account of Bout's arrest. In its decision of August 24, 2011,

this Court generally found Bout's version of the interview to be more credible than the version

advanced by the agents. *See* Exhibit "L" at 9, n. 47. More particularly, the Court stated that the

agents' representation to Bout to the effect that the Thai police would not allow the defendant to

talk to the DEA on the day following the arrest was false. *Id.* at 9. The Court also found that the

agents were not credible (1) when they denied insinuating that Bout might return to the United

States with them immediately if he "cooperated" with them and waived extradition and (2) when

they denied telling Bout that he would face disease, hunger, heat, and rape in Thai jails where he

---

[8] The transcript of the Thai court proceeding, as translated from Thai back into English by the court staff, literally
reflects the following: "I just ~~testified as a witness~~ at the United States District Court, Southern District of New York."
                                        swore to the complaint
As such, while the words "testified as a witness" appear to be crossed out and changed to "swore to the complaint,"
the discrepancy and its potential effect on the validity of Bout's indictment warrant further exploration.

would be abandoned if he did not cooperate with the Americans. *Id.* While the Court's opinion of August 24 appeared to have given little credit to the statements the agents made, in an extremely rare turn of events, this tribunal vacated its own decision the very next day and substituted it with another ruling barren of any credibility determinations. *See* Exhibit "M." The Court found that it was unnecessary to make a credibility determination for purposes of resolving Bout's request for the suppression of post-arrest statements.[9] *Id.* at 9. Uninformed on the subject by his trial counsel, Bout believed at the time that the Court's decision to reverse itself was made *sua sponte* without any Government involvement. *See* Exhibit "J." Yet, evidence received after the conclusion of Bout's trial casts doubt on the propriety of the Government's representations to this Court in seeking the removal of the adverse credibility finding relative to lead DEA agents in charge of the investigation. Bout's defense is in receipt of transcripts from the trial of Bout's acquaintance Richard Chichakli that show that the Government requested to excise the credibility determination from this Court opinion of August 24, 2011. *See* Exhibit "I."

As part of Chichakli's trial, Assistant U.S. Attorney Brendan McGuire testified as to certain issues surrounding the credibility of DEA Agent Zachariasiewicz, who was to provide testimony on the chain-of-custody of Bout's laptop in that parallel prosecution. Judge William Pauley III, who presided over Chichakli's trial, was predominantly concerned with the ruling this Court made on August 24, 2011 that was later overturned. *See id.* at 267. What comes out of Chichakli's transcripts is that on the day after this Court issued an order suppressing Bout's post-arrest statements and issuing an adverse credibility finding against agents Milione and Zachariasiewicz, two telephone conferences took place with the Court, the Government and the

---

[9] While the credibility determination might not have been necessary for the suppression of post-arrest statements, trial counsel raised the argument for the suppression of the post-arrest statements as part of a larger motion challenging the entire prosecution and the indictment. As such, a credibility determination might have been vital to trial counsel's other arguments.

defense on the line. *See id.* at 262, 265. Later on August 25, 2011, this Court withdrew its opinion of August 24, 2011 and substituted it with another opinion that similarly suppressed Bout's post-arrest statements, but took out the adverse credibility finding which it said was not necessary to the suppression of the statement. *See id.* at 474. What the defense has gleaned from Chichakli's trial is that the U.S. Attorney's Office helped edit this Court's opinion to take out any reference to the credibility finding. *See id.* at 267. According to AUSA McGuire's testimony, this Court made a proposal to the Government in the morning of August 25, 2011 and then AUSA McGuire consulted with "the higher ups in the office" whether to accept the proposal. *See id.* at 473. In the second conference call, the Government apparently accepted the proposal. *Id.* Throughout Chichakli's transcripts, Judge Pauley repeatedly referred to what had transpired as an "arrangement" between the Government and the Court. *See id.* at 478. As highlighted in Judge Pauley's comments, there was no court reporter and no transcript generated of the two conference calls. *See id.* at 264. Chichakli's transcripts also show that the withdrawal of the Court's decision took place without any formal submission by the U.S. Attorney's Office seeking the reconsideration of an earlier ruling. *See id.* at 261. AUSA McGuire testified that during the conference call, defense counsel waived Bout's presence because the Court noted at the outset of the conversation "that [it] was going to be a discussion of purely legal matters relating to a previously-filed motion." *See id.* at 262. Bout himself had not been made aware by his trial lawyer of this exchange and its content. *See* Exhibit "J."

This Court's finding in its initial decision of August 24, 2011 had the effect of impeaching the credibility of the lead agent who investigated Bout and put the whole operation together. A ruling to the effect that the principal agent could not be trusted would be devastating to the Government, as it would cast a shadow of doubt over the DEA's entire sting directed at Bout. The lead agent was involved in developing the testimony of other Government witnesses,

including the key Government witness Smulian. In fact, Smulian met with the Government over 20 times. (Tr. 1340). More importantly, the adverse credibility finding would seriously call into question the substance and credibility of the agent's testimony to the grand jury. Due process requires the prosecution to seek a new indictment whenever subsequent events significantly undermine the credibility of grand jury witnesses. *See United States v. Guillette*, 547 F.2d 743, 753 (2d Cir. 1976). Grand jury testimony that is held to be underserving of the court's credence by post-indictment events is an invalid basis for an indictment. If the Court had not withdrawn its adverse credibility finding as to the DEA agents, the indictment returned against Bout based on their testimony would become infirm. What came to light in the course of gathering new evidence for the instant motion is that the Government persuaded the Court to remove the adverse credibility finding in an apparent "arrangement" done in the absence of the accused, an arrangement for which no records were created. There are grounds to believe that the ultimate result of excising the credibility finding was preserving the validity of Bout's original indictment.

**(1) On a claim of Government misconduct or negligence in permitting non-credible testimony to stand uncorrected before the jury, a legal standard that is different from the one used in conventional "new evidence" Rule 33 motions should be applied.**

Even as the conventional test for a new evidence motion asks (1) whether the evidence is newly discovered, (2) whether the evidence is material and not merely cumulative, and (3) whether the newly discovered evidence is bound to be outcome-determinative in a new trial, circuit courts apply a different standard in cases implicating misconduct or negligence on the part of the Government. Under Second Circuit precedent, in assessing a Rule 33 motion based on allegations of prosecutorial misconduct and perjured testimony, "the defendant must show that (i) the witness actually committed perjury ...; (ii) the alleged perjury was material ...; (iii) the Government knew or should have known of the perjury at [the] time of trial ...; and (iv) the

- 16 -

perjured testimony remained undisclosed during trial ..." *United States v. Nash*, 338 Fed.Appx. 96, 99 (2d Cir. 2009) (citing *United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009)). As such, there is more than one test to be applied by courts within the Second Circuit in adjudicating a new trial motion based on newly discovered evidence.

Alongside the above standard to be applied in Government misconduct cases, Second Circuit decision also impose a duty upon prosecutors to identify and remedy instances of untruthful statements given before the grand jury. Court decisions in this circuit have cited with approval the Ninth Circuit decision in *United States v. Basurto*, 497 F.2d 781 (9th Cir. 1974). *See Guillette*, 547 F.2d 743, 753 (1976); *United States v. Goldman*, 451 F.Supp. 518 (S.D.N.Y. 1978). In *Basurto*, the prosecutor learned prior to trial that an unindicted co-conspirator, who testified to the defendants' activities before the grand jury, had lied in material respects. *Basurto*, *supra*. Instead of immediately notifying the court or the grand jury of the perjury, the prosecutor proceeded to trial, revealing the fact of the witness's false grand jury testimony in his opening statement to the trial jury. *Id.* The circuit court reversed the defendants' conviction and dismissed the indictment. *Id.* The court went on to say that due process requires that whenever the prosecutor learns of any perjury committed before the grand jury, he must immediately inform the court and opposing counsel and, if the perjury may be material, also the grand jury. *Id.* at 785-6. The *Basurto* court held that a defendant's right to due process is violated when he is forced to stand trial on an indictment which the Government knew was based partially on perjured testimony, the perjured testimony was material, and jeopardy had not attached. *Id.* at 785.

**(2) The evidence presented is adequate Rule 33 evidence for purposes of this proceeding.**

The principles enunciated in *Basurto*, *supra*, and approved in dicta by the Second Circuit in *Guillette*, *supra*, control the outcome in this case. If one assumes that Agent Zachariasiewicz

testified before the grand jury about Bout's arrest in Bangkok, that testimony – especially if it included references to Bout's "confession" – was likely crucial to the defendant's indictment. In its decision of August 24, 2011, this Court declined to give credence to Zachariasiewicz's statements. The ruling for all practical purposes found the agent's statements to be untrue in at least several respects. More than that, the decision also found the statements the agent gave to be material. ("Zachariasiewicz gave the following material testimony," *see* Exhibit "L" at 3). The same false testimony was "material" before the grand jury, if one assumes that Zachariasiewicz recounted the story of Bout's arrest and the ensuing verbal exchange in his testimony to procure Bout's indictment. *See Goldman*, 451 F.Supp. 518, 520 (1978). Lastly, at the time of this Court's ruling affecting the integrity of Zachariasiewicz's testimony, jeopardy had not yet attached.

  Having gone through the *Basutro* factors, the Court should next satisfy itself that the *Nash* prongs for seeking a new trial in instances of Government misconduct over perjury are met. The first two of these, *i.e.* whether the witness actually gave an untruthful statement and whether that statement was material, have already been addressed in the analysis above. What remains for this Court to determine is whether the Government knew or should have known of the untruthful statement and whether it remained undisclosed during the relevant pretrial proceedings. Based on the account of how this Court's opinion of August 24 was substituted for another ruling the very next day, it is clear that the Government was cognizant as to the negative ramifications an adverse credibility finding presented. Arguably, out of the entire decision suppressing Bout's alleged post-arrest confession, it is only the fragments dealing with the agents' adverse credibility that the Government saw as objectionable. The transcripts from Chichakli's trial shed light on what the prosecutors' chief argument in opposition to the adverse credibility finding was. The most important concern was that the adverse credibility finding would haunt the DEA agents going forward and compromise their participation as part of unspecified future trials. *See*

Exhibit "I" at 474. Chichakli's transcripts reflect no discussion about the impact of the adverse credibility finding on the indictment or whether Agent Zachariasiewicz indeed testified before the grand jury. In view of the Government's preoccupation with the adverse credibility determination, any reasonable jurist should conclude that at the very least the assistant U.S. attorneys handling Bout's matter should have remembered whether the DEA agents affected by the Court's order gave testimony before the grand jury.

When the Court found Agent Zachariasiewicz a witness underserving of its credence, it placed upon the assistant U.S. attorneys a duty of disclosure as to whether the agent testified before the grand jury. *See United States v. Miller*, 411 F.2d 825, 832 (2d Cir. 1969). This duty the Government likely failed to discharge. For purposes of this inquiry, it does not matter whether the Government withheld the relevant information from disclosure intentionally or by mere negligence. Negligence of the prosecutor in failing to make evidence available to the defense reduces the standard of materiality needed to require the granting of a new trial below the formulations applicable to cases where no prosecutorial misconduct exists. *Id.* (citing *United States v. Consolidated Laundries Corp.*, 291 F.2d 563, 570-571 (2d Cir. 1961)). When ruling to withdraw its opinion, this Court potentially was left without the necessary guidance to make an informed decision. The appropriate action to be taken at that particular juncture was to require the Government to go back to the grand jury and to seek a new indictment untainted by the agent's non-credible statements. *Goldman*, 451 F.Supp. 518, 521 (1978).

**(3) Dismissal of the indictment would be an appropriate remedy if the agent giving material testimony to the jury was found adversely credible before jeopardy had attached.**

Although the relevant *Nash* standard does not require a showing to the effect that the misconduct was outcome-determinative, the Court should find it instructive that the dismissal of Bout's indictment would likely be warranted under the circumstances of this case. The Supreme

Court has recognized that the supervisory power of Article III judges should be used "to implement a remedy for a violation of recognized rights, to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury, and finally, as a remedy designed to deter illegal conduct." *United States v. Hasting*, 461 U.S. 499, 505 (1983). In *Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988), the Supreme Court found that it would be appropriate to exercise supervisory powers to dismiss an indictment because of misconduct before the grand jury where that misconduct amounts to a violation of one of those few, clear rules which were carefully drafted and approved by the Supreme Court and by Congress to ensure the integrity of the grand jury's functions. *Id.* at 256; *see also United States v. Mechanik*, 475 U.S. 66, 74 (1986) (O'Connor, J., concurring in judgment). In a later case of *United States v. Williams*, 504 U.S. 36 (1992), the Supreme Court addressed what those "few, clear rules" were in a footnote, stating that "Rule 6 of the Federal Rules of Criminal Procedure contains a number of such rules." *Id.* The footnote then notes that "[a]dditional standards of behavior for prosecutors (and others) are set forth in the United States Code," listing "18 U.S.C. §§ 6002, 6003 (setting forth procedures for granting a witness immunity from prosecution); § 1623 (criminalizing false declarations before the grand jury); § 2515 (prohibiting grand jury use of unlawfully intercepted wire or oral communications); and § 1622 (criminalizing subornation of perjury)." *Id.*

The grand jury in this case was charged with investigating Bout's conspiracy offense involving a meeting with purported FARC operatives in Bangkok. Assuming Agent Zachariasiewicz testified to the grand jury about the events inside the Sofitel meeting room following the arrest and Bout's alleged confession, his statements were undoubtedly capable of influencing the grand jury's determination of whether to indict the defendant. The fact that the agent's assertions later found non-credible remained undisclosed to the Court upon the Government's oral application for a revision of the adverse credibility finding supplies the

necessary prosecutorial misconduct element required for dismissal under the holding in *Nova Scotia*, *supra*.

> **(4) It is of no legal significance whether or not Bout's counsel was privy to the discussion between the Government and the Court.**

The Court should not find relevant to its inquiry the fact that Bout's trial counsel had knowledge of the two telephonic exchanges on August 25, 2011. On a fundamental level, the test for granting a new trial on a showing of "prosecutorial misconduct" never does pose the question of whether or not the newly discovered evidence was known to the defense at the time of trial. Even if that had been the relevant inquiry, the Court would be bound to recognize that although the events of August 25, 2011 were known to the Government and to the Court, defendant Viktor Bout had no knowledge as to the two unreported telephone conferences that culminated in the Court's withdrawal of an earlier opinion finding the agents undeserving of its credence. Bout's trial counsel waived the defendant's presence without having consulted the defendant himself. *See* Exhibit "J." Bout's newly retained attorneys learned of what transpired during the conference calls from AUSA McGuire's testimony given as part of Richard Chichakli's trial. As follows from AUSA McGuire's testimony, the Government did not advise the Court or Bout's trial attorney as to what possible negative ramifications an adverse credibility finding would create relative to Bout's underlying indictment. Bout's attorney, apparently unaware of the legal possibility that an adverse credibility determination made in the course of a pretrial proceeding may invalidate an indictment, took no action.

While in some cases it is appropriate for an attorney's knowledge to be imputed to the client, particularly where the attorney informs his client and receives his consent at appropriate procedural stages, this is not the situation now presented. In the instant case, the defendant never gave his counsel consent to waive his presence on the phone calls. *Id.* Principles of agency

applicable in the attorney-client relationship do not apply under present circumstances where a client's consent was waived on not one, but two occasions in the absence of even a brief consultation with him. Viewed from another angle, imputing counsel's knowledge regarding the conference calls to Bout would fly in the face of decades-long jurisprudence addressing ineffective assistance of counsel claims.

### B. A hearing is warranted as to the propriety of the Government's involvement in getting the adverse credibility finding withdrawn.

While neither Milione nor Zachariasiewicz testified as part of Bout's case-in-chief, the adverse credibility finding in relation to those agents that this Court made in its opinion of August 24, 2011 portended detrimental consequences for the prosecution. Questions regarding the propriety of the Government's conduct in getting this Court to withdrawal its adverse credibility finding justify a hearing on Bout's new trial motion – especially as these questions relate to the DEA agents' grand jury testimony.

## III. NEW TRIAL SHOULD BE ORDERED BECAUSE THE EVIDENCE SHOWS THAT SMULIAN MISLED THE JURY WHEN HE TESTIFIED THAT BOUT CALLED A BULGARIAN ARMS SUPPLIER FOR SURFACE-TO-AIR MISSILES.

### A. Newly discovered evidence shows that Bout did not consider Smulian's offer of an arms deal seriously because he never made any calls to Peter Mirchev.

#### (1) Mirchev's declaration shows that Bout never treated seriously the deal with the alleged FARC members.

The declaration secured from Peter Mirchev, the alleged source of armaments that Bout reached out to in discussing with Smulian the deal with the FARC, shows that the Government's star witness Smulian falsely testified to Bout's calling the Bulgarian arms supplier. The Mirchev declaration exposes a blatant lie that Smulian told the Court to impress upon the jurors that Bout had the ability to supply one hundred surface-to-air missiles anywhere in the world on a

moment's notice. The declaration states that Bout never did talk to Mirchev about surface-to-air missiles during the relevant time period when Smulian alleged that the phone call was made. *See* Exhibit "H" at ¶¶9-11. The document also briefly recounts the history of Mirchev's prior relationship with Bout. Mirchev stated in his declaration that he did not have any regular business with Bout, and that their interaction in the years following Bout's withdrawal from the air cargo industry was intermittent at best. *See id.* at ¶4. The declaration goes on to say that Mirchev and Bout had an understanding that they contact each other only on vetted and mutually-rewarding business transactions, not just on any speculative deal. *See id.* at ¶5. In this case, the fact that Bout did not reach out to Mirchev shows that he never treated seriously Smulian's proposition.

### (2) The evidence presented is in fact newly discovered.

The new evidence relative to Mirchev's not having any conversations with Bout about the surface-to-air missiles has been obtained following Bout's trial. It could not have been discovered beforehand. While the defendant himself knew Mirchev, his trial counsel appears to have been caught by surprise when the prosecution asked Smulian to testify regarding the disputed matter. Even as Bout became aware of the evidence midway through the trial, it was physically impossible for trial counsel at that point to acquire evidence to controvert Smulian's assertion. Trial counsel endeavored as best as he could to debunk Smulian's untruthful testimony by way of cross-examination. Yet, under no circumstances, would Bout's attorney have been able to get Mirchev to testify in a U.S. District Court. For one, Mirchev likely faced a threat of prosecution in the United States. Mirchev's affidavit makes clear that he had grave misgivings about communicating with trial counsel Albert Dayan for fear of possible repercussions that might ensue. *See id.* at ¶13.

**B.  The outcome would have been different, had the evidence been presented.**

Smulian's testimony of Bout's conversation with Mirchev had a significant impact on the jury's guilty verdict. For all the allegations of Bout's ability to procure and supply vast arsenals of weapons, the only source for the surface-to-air missiles that Bout purportedly planned to utilize was Mirchev. During the trial and at closing arguments, the Government drew attention to a phone call that Bout made in the course of his discussion with Smulian as to the FARC's urgent need for surface-to-air missiles. Relying on Smulian's testimony, the Government argued that Bout called Mirchev, a Bulgarian arms manufacturer, just as soon as Smulian brought his name up in the conversation. The purpose of Bout's reaching out to Mirchev, according to the Government, was to arrange for the supply of the Igla surface-to-air missiles. In its summation, the Government asserted that the context of the Moscow meeting with Smulian made clear that Bout called Mirchev. (Tr. 1627). It is plain to see that without Smulian's testimony as to Mirchev's readiness to supply one hundred missiles to Bout, the Government would not have enough evidence to prove the anti-aircraft-missile conspiracy count, which yielded the 25-year sentence for the defendant.

## CONCLUSION

For the foregoing reasons, Bout asks this Court to order a hearing and to grant a new trial in the interests of justice, pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

Respectfully submitted,

/s/ Alexey Tarasov
Alexey V. Tarasov, Esq.

***Attorney for Defendant***

Texas Bar Card No. 24075140

723 Main Street, Suite 310
Houston, Texas 77002

APPENDIX 1

**Listing of the evidence submitted in connection
with defendant Viktor Bout's motion for new trial**

| Exhibit designation | Content of exhibit |
|---|---|
| **Exhibit "A"[10]** | Documentary film *The Notorious Mr. Bout* directed by filmmakers Tony Gerber and Maxim Pozdorovkin in 2014. |
| **Exhibit "B"** | Thai immigration records showing that Smulian left Bangkok on March 6, 2008 at 22:56 local time. |
| **Exhibit "C"** | Electronic correspondence found on Smulian's computer, where Snow offers Smulian to become involved in a law enforcement operation. |
| **Exhibit "D"** | Counsel's affirmation relative to representations of Mike Snow's work for MI6. |
| **Exhibit "E"** | History of MI6 saved on Smulian's computer. |
| **Exhibit "F"** | A fax sent from Smulian's spouse residing in Africa to Bout's former Moscow-based attorney. |
| **Exhibit "G"** | Declaration of Bout's wife as to how the fax came to be in her possession. |
| **Exhibit "H"** | Peter Mirchev's declaration. |
| **Exhibit "I"** | Transcripts from the trial of Richard Chichakli. |
| **Exhibit "J"** | Affidavit of Bout to the effect that he had not been made aware of the telephone conference calls of August 25, 2011. |
| **Exhibit "K"** | Transcript of Agent Zachariasiewicz's testimony in the extradition hearings in the Thai lower court on September 22, 2008 to the effect that he testified as a witness in the U.S. court proceeding. |
| **Exhibit "L"** | Decision of this Court of August 24, 2011. |
| **Exhibit "M"** | Decision of this Court of August 25, 2011. |
| **Exhibit "N"** | Agent Zachariasiewicz's report of investigation chronicling Bout's post-arrest statements. |

---

[10] A disk containing the film has been mailed to the Court and served on the Government in advance of counsel's filing the foregoing memorandum.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

United States,

      Plaintiff                                     08-cr-365

vs.

      Viktor Bout,                      **CERTIFICATE OF SERVICE**

      Defendant.

_____

    I hereby certify that the attached pleading has been served via the ECF system on:

Brendan Robert McGuire
U.S. Attorney's Office
1 St. Andrews Plaza
New York, NY 10007

E-mail: Brendan.McGuire@usdoj.gov

Respectfully submitted
this 1st day of June 2015.

/s/ Alexey Tarasov

Alexey V. Tarasov, Esq.

***Attorney for Defendant***

Texas Bar Card No. 24075140

723 Main Street, Suite 310
Houston, Texas 77002

Tel.: 832-623-6250
Fax: 832-495-4168

- 26 -