UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

UNITED STATES OF AMERICA

- against -

**OPINION AND ORDER**

VIKTOR BOUT,

**08-cr-365 (SAS)**

Defendant.

-------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10 26 15

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION[1]

On November 2, 2011, Viktor Bout was convicted on four conspiracy

charges related to weapons trafficking. Bout now moves for a new trial based on

new evidence, under Rule 33 of the Federal Rules of Criminal Procedure.[2] In the

alternative, Bout requests an evidentiary hearing on this motion. For the following

reasons, Bout's motion and request for an evidentiary hearing are DENIED.

---

[1]    Although this Opinion may not recite all facts and arguments raised
by the parties, the Court has considered all of the legal arguments asserted by the
parties and all of the relevant, material facts contained in the parties' submissions.

[2]    Rule 33 motions for a new trial based on newly discovered evidence
generally must be filed within three years of the verdict. On March 27, 2015,
however, this Court granted Bout an extension to file his Rule 33 motion by June
1, 2015.

1

## II.    BACKGROUND

### A.    Sting Operation and Arrest[3]

On March 6, 2008, Bout was arrested in Bangkok, Thailand on weapons trafficking charges, as part of an international sting operation carried out by the United States Drug Enforcement Administration ("DEA").  The DEA initiated the sting operation in the fall of 2007, orchestrating a fake deal to procure surface-to-air missiles for a terrorist organization.[4]  To carry out the operation, the DEA directed three confidential sources – two of whom posed as members of the Colombian terrorist organization *Fuerzas Armadas Revolucionarias de Colombia* ("FARC") – to propose the weapons deal to Andrew Smulian, a former business associate of Bout's.[5]  One of the confidential sources, Mike Snow, had a prior business relationship with Smulian.[6]  Smulian, in turn, told Bout about the proposal, and Bout authorized Smulian to negotiate the transaction.[7]

---

[3]    Although the following account is consistent with the facts presented by the Government at trial, Bout's motion challenges some of the facts described herein.

[4]    *See* Government's Memorandum of Law in Opposition to Defendant's Motion for New Trial ("Opp. Mem.") at 3.

[5]    *See id.*

[6]    *See id.*

[7]    *See id.* at 3-4.

On March 6, 2008, Bout and Smulian met with the three confidential sources in a secretly-recorded meeting in Bangkok.[8]  During that recorded meeting, Bout agreed to take the steps necessary to deliver the weapons shipment – which included 700 to 800 surface-to-air missiles – to FARC.[9]  At the conclusion of this meeting, Bout and Smulian were arrested.[10]

After their arrest, Bout and Smulian were questioned separately by DEA agents.[11]  During questioning, Bout told DEA Special Agent Rob Zachariasiewicz and other agents, *inter alia*, that "[I]f everything is recorded th[e]n you have everything – you have all the cards on the table."[12]  Soon after Smulian's interview, Smulian agreed to cooperate with the DEA and against Bout.[13]

## B.    Indictment

During the grand jury proceedings, Agent Zachariasiewicz testified

---

[8]      *See id.* at 3-4.

[9]      *See id.*

[10]     *See id.*

[11]     *See* 3/21/08 Zachariasiewicz Report of Investigation, Ex. N to Defendant's Memorandum in Support of Motion for a New Trial ("Def. Mem."), at 1-2.

[12]     *Id.* at 2.

[13]     *See* Opp. Mem. at 2.  In July 2008, Smulian signed a cooperation agreement and pleaded guilty before this Court to a four-count Information.  *See id.* at 5.

about the sting operation and arrest, but did not testify about Bout's post-arrest statements.[14]  On April 24, 2008, the grand jury returned an Indictment against Bout, alleging his participation in conspiracies to:  (1) kill United States nationals;[15] (2) kill officers and employees of the United States;[16] (3) acquire, transfer, or use anti-aircraft missiles;[17] and (4) provide material support to a designated foreign terrorist organization.[18]  Smulian was the only individual with whom Bout was alleged to have conspired.[19]

### C.    Suppression Motion

On April 22, 2011, Bout moved to suppress certain of his post-arrest statements.  On August 24, 2011, before trial, this Court issued an Opinion and Order (the "August 24, 2011 Opinion") suppressing Bout's post-arrest statements and including adverse credibility findings against Agent Zachariasiewicz and another agent who participated in Bout's post-arrest questioning.[20]

---

[14]     *See* 4/24/08 Grand Jury Transcript, Ex. D to Opp. Mem.

[15]     *See* 18 U.S.C. § 2332(b).

[16]     *See id.* §§ 1114, 1117.

[17]     *See id.* § 2332(g).

[18]     *See id.* § 2339(B).

[19]     *See* Def. Mem. at 1.

[20]     *See* 8/24/11 Opinion and Order, Ex. L to Def. Mem.

As described by the Government during a 2013 conference in *United States v. Chichakli* before a different District Court Judge (the "*Chichakli* transcript"), "[s]hortly after the issuance of th[is Court's] opinion" on August 24, 2011, "the government issued a statement indicating that it planned to seek reconsideration of that order"[21] because it "found that [the] findings as to the credibility of the[] agents was unsupported by the record."[22] Later that day, two teleconferences were held among defense counsel, the Government, and the Court.[23] On the first call, as described in the *Chichakli* transcript, the Court asked whether, "because [the August 24, 2011] decision did not hinge on the credibility findings . . . of the agents, . . . the government would continue in its efforts to seek reconsideration if the opinion . . . was vacated and a new opinion was issued which did not make, or rely, upon any credibility findings."[24] On the second call, "the government indicated that the [Court's] proposal was acceptable, and that the

---

[21]    11/21/13 Transcript of Conference in *United States v. Chichakli*, No. 09 Cr. 1002 (Dkt. No. 254) ("*Chichakli* Tr."), Ex. I to Def. Mem., at 261:1-3 (Assistant United States Attorney ("AUSA") Brendan McGuire).

[22]    *Id.* at 481:18-20 (AUSA McGuire).

[23]    *See* Def. Mem. at 14-15; *Chichakli* Tr. at 262:5-263:14 (AUSA McGuire).  These teleconferences were not on the record.  *See id.* at 262:8-9, 263:17-18.

[24]    *Chichakli* Tr. at 262:24-263:4 (AUSA McGuire).

government would refrain from seeking reconsideration of a new order that did not make or rely upon any credibility findings."[25]  On August 25, 2011, this Court withdrew the August 24, 2011 Opinion and issued a revised Opinion and Order (the "August 25, 2011 Opinion").  The August 25, 2011 Opinion also suppressed Bout's post-arrest statements but did not contain adverse credibility findings against the DEA agents.[26]

### D.  Trial

At Bout's trial, DEA Special Agent William Brown stated that the DEA had identified Smulian as "an associate of Bout's for the sources to approach" with the proposed weapons deal, given that Smulian had relationships with both Snow and Bout.[27]  Also at trial, Smulian testified that in January 2008, he had witnessed Bout calling Bulgarian arms dealer Peter Mirchev to inquire about the availability of one hundred surface-to-air missiles.[28]

On November 2, 2011, a jury convicted Bout on all four counts.[29]  On

---

[25]     *Id.* at 263:10-14 (AUSA McGuire).

[26]     *See* 8/25/11 Opinion and Order, Ex. M to Def. Mem.

[27]     Opp. Mem. at 8.

[28]     *See* Def. Mem. at 22.

[29]     *See id.* at 1.

April 5, 2012, this Court sentenced Bout to twenty-five years in prison.[30]

## III.  LEGAL STANDARD

### A.  Rule 33 Motions for a New Trial

#### 1.  Generally

Rule 33 allows a district court to "vacate any judgment and grant a new trial if the interest of justice so requires."[31]  As such, "[t]his rule 'confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.'"[32]  Before ordering a new trial, however, the "district court must find there is a real concern that an innocent person may have been convicted."[33]  Thus, Rule 33 motions are granted "only in extraordinary circumstances."[34]

"The defendant bears the burden of proving that he is entitled to a new

---

[30]    *See id.* at 2.  The twenty-five year sentence was imposed on Bout's 18 U.S.C. 2332(g) conviction.  The sentences on the other three counts were imposed concurrently.  *See id.* at 2 n.1.

[31]    Fed. R. Crim. P. 33(a).

[32]    *United States v. Polouizzi*, 564 F.3d 142, 159 (2d Cir. 2009) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)).

[33]    *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (quotation marks and citations omitted).

[34]    *Id.* (quotation marks and citations omitted).

7

trial"[35] and motions for a new trial filed more than fourteen days after the verdict is issued must be based on "newly discovered evidence."[36] "Relief under Rule 33 based upon newly discovered evidence" requires a five-part "showing that (1) the evidence [was] newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal."[37]

With respect to the first prong of this test, "not only must the defendant show that the evidence was discovered after trial, but he must also demonstrate that the evidence 'could not with due diligence have been discovered before or during trial.'"[38] Where "a defendant knew or should have known[] that his codefendant could offer material testimony as to the defendant's role in the charged crime, the defendant cannot claim that he 'discovered' that evidence only after trial."[39] "The failure to exercise due diligence does not provide a legal basis

---

[35]     *Id.*

[36]     Fed. R. Crim. P. 33(b).

[37]     *United States v. Forbes*, 790 F.3d 403, 406-07 (2d Cir. 2015) (citing *United States v. Owen*, 500 F.3d 83, 88 (2d Cir. 2007)) (quotation marks omitted).

[38]     *Id.* at 408-09 (quoting *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir. 1980)).

[39]     *Owen*, 500 F.3d at 89.

for the unavailability of evidence."[40]  "[I]f the reason that testimonial evidence was unavailable at trial was the defendant's failure to call a witness that he knew could provide exculpatory testimony, a new trial on the basis of newly discovered evidence would not be warranted."[41]

Additionally, Rule 33 "motions based solely on affidavits are disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations."[42]

### 2.    Perjury by a Government Witness

"[W]hen the newly discovered evidence focuses on the perjury of a witness, a threshold inquiry is whether the evidence demonstrates that the witness in fact committed perjury."[43]  Accordingly, to succeed on a motion for a new trial based on perjury, a defendant must show that:  (1) "the 'newly discovered evidence' could not with due diligence have been discovered before or during trial"; (2) "the evidence demonstrates that the witness in fact committed perjury"; (3) "the newly discovered evidence [is] material"; and (4) the newly discovered

---

[40]    *Forbes*, 790 F.3d at 409 (alteration omitted).

[41]    *Id.*

[42]    *Herrera v. Collins*, 506 U.S. 390, 417 (1993).

[43]    *United States v. White*, 972 F.2d 16, 20 (2d Cir. 1992).

evidence is not cumulative.[44]  In other words, "[f]or Rule 33 motions based on newly discovered evidence of perjury, the defendant must, among other things, pass two threshold inquiries — he must present some newly discovered evidence and must prove that 'the witness in fact committed perjury.'"[45]

A witness commits perjury "'when he[] gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory.'"[46]  If a court concludes that perjury was committed, "there are different standards of review on this issue depending upon whether the prosecution knew or should have known of the perjury."[47]  "[I]f the prosecution is charged with knowledge of the perjury, the conviction must be set aside 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"[48]  However, "[i]f the prosecution was unaware of the perjury, a new trial

---

[44]     *Id.* at 20-21.

[45]     *United States v. Bourke*, 488 Fed. App'x 528, 529 (2d Cir. 2012) (quoting *United States v. Stewart*, 433 F.3d 273, 297 (2d Cir. 2006) (further citation omitted)).

[46]     *United States v. Hernandez*, 521 Fed. App'x 14, 16 (2d Cir. 2013) (quoting *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001)).

[47]     *White*, 972 F.2d at 21 (citing *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)).

[48]     *Id.* (quoting *Wallach*, 935 F.2d at 456)).

is warranted if 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'"[49]

### 3. Evidentiary Hearings

A district court may deny a Rule 33 motion without holding an evidentiary hearing where it determines that the evidence "is not newly discovered as a matter of law."[50]

### B. Post-Conviction Dismissal of an Indictment

"A guilty verdict by a petit jury remedies any possible defects in the grand jury indictment."[51] "[T]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt."[52] Accordingly, "'[d]ismissal of an indictment following a conviction is an 'extraordinary' remedy'"[53] that can only be justified "not [by] any need for

---

[49] *Id.* (quoting *Wallach*, 935 F.2d at 456)) (alteration in original).

[50] *Forbes*, 790 F.3d at 411.

[51] *United States v. Eltayib*, 88 F.3d 156, 173 (2d Cir. 1996) (citing *United States v. Mechanik*, 475 U.S. 66, 72-73 (1986)).

[52] *Mechanik*, 475 U.S. at 70.

[53] *United States v. Lombardozzi*, 491 F.3d 61, 79 (2d Cir. 2007) (quoting *United States v. Casamento*, 887 F.2d 1141, 1182 (2d Cir. 2007) (alteration omitted)).

securing justice . . . but rather [by] a desire to maintain proper prosecutorial standards generally."[54]  Where "subsequent events merely cast doubt on the credibility of grand jury witnesses, due process does not require the prosecution to notify the grand jury of those events and seek a new indictment."[55]  "Hence, the sanction is reserved for very limited and extreme circumstances."[56]

## IV.    APPLICABLE LAW

"A conspiracy is an 'agreement among the conspirators.'"[57]  Because federal conspiracy liability requires "[a] meeting of the minds[,] . . . [t]wo people have to engage in the 'act of agreeing' in order for this requirement to be met."[58]  Accordingly, "a 'person who enters into such an agreement while acting as an agent of the government, either directly or as a confidential informant, lacks the

---

[54]    *United States v. Thibadeau*, 671 F.2d 75, 78 (2d Cir. 1982).

[55]    *United States v. Guillette*, 547 F.2d 743, 753 (2d Cir. 1976).

[56]    *Thibadeau*, 671 F.2d at 78 (quotation marks and citation omitted).

[57]    *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977) (quoting *United States v. Falcone*, 311 U.S. 205, 210 (1940)).  *Accord id.* at 38 n.2 ("Many jurisdictions have adopted the Model Penal Code's 'unilateral' formulation of conspiracy.  Under that formulation, conspiracy is defined in terms of one person[] agreeing with another, rather than in terms of an agreement among or between two or more people.  The federal definition [of conspiracy] retains the traditional, common law, 'bilateral' formulation.") (citations omitted).

[58]    *United States v. Ulbricht*, 31 F. Supp. 3d 540, 551 (S.D.N.Y. 2014) (quoting *Rosenblatt*, 554 F.2d at 38).

criminal intent necessary to render him a *bona fide* co-conspirator.'"[59]

## V.    DISCUSSION

Bout's motion rests on three "newly discovered" bases:  (1) evidence purportedly establishing that Smulian was a Government agent throughout the sting operation; (2) a recent declaration from Mirchev contradicting Smulian's trial testimony; and (3) a transcript from a subsequent case allegedly undermining Bout's Indictment.  None of the evidence Bout offers, however, satisfies Rule 33's requirements for a new trial based on newly discovered evidence.

### A.    Evidence Regarding Smulian's Role in the Sting Operation

In this first category, Bout offers five pieces of evidence in support of his theory that Smulian acted at the Government's direction throughout the Bout investigation.  Based on this evidence, Bout argues that Smulian and Bout could not, as a matter of law, have entered into the four conspiracies for which Bout was convicted because federal conspiracies require at least two *bona fide* co-conspirators.  As explained below, all of Bout's evidence regarding Smulian's purported informant status falls short of Rule 33's threshold.

### 1.    May 13, 2008 Fax from "Cheryl Smulian"

The first piece of evidence is a May 13, 2008 fax, allegedly sent from

---

[59]    *United States v. Carlton*, 442 F.3d 802, 811 (2d Cir. 2006) (quoting *United States v. Vazquez*, 113 F.3d 383 (2d Cir. 1997)).

Smulian's ex-wife to a Moscow law firm that previously represented Bout in international matters. The fax states that, in exchange for one million dollars, Smulian "will not let [Bout] down or even breath [sic] a word about [Bout]" and will "make sure Andrew [Smulian] protects [Bout]."[60] Bout argues that this "evidence of attempted extortion by Smulian's wife of Bout's family immediately after the arrest shows that Smulian was very much capable of changing his story."[61]

As an initial matter, this evidence is not newly discovered at all: Bout concedes that this fax was produced to him by the Government before trial.[62] At this stage, Rule 33 bars this Court from considering evidence that Bout had at his disposal during trial. Even assuming that this fax could be considered on a Rule 33 motion, its introduction at trial is unlikely to have resulted in an acquittal. At best, this fax demonstrates that Smulian and Bout participated in some unlawful activity together, and that Smulian was prepared to testify against Bout in connection with this activity. Additionally, despite Bout's characterization that this fax was sent "immediately after the arrest,"[63] its May 13, 2008 timestamp indicates that this fax

---

[60] 5/13/08 Fax from Cheryl Smulian, Ex. F to Def. Mem.

[61] Def. Mem. at 7.

[62] *See* Defendant's Corrected Reply to the Government's Response ("Reply Mem.") at 8. *See also* Disclosure 3505-49, Ex. A to Opp. Mem.

[63] Def. Mem. at 7.

was sent more than two months after Bout's arrest.  In other words, this fax neither undermines the jury's finding that Smulian and Bout were co-conspirators, nor does it provide any additional information about whether Smulian was, in fact, a Government agent.

### 2. March 6, 2008 Immigration Record of Smulian's Flight from Thailand

Bout also presents a Thai immigration record that he claims demonstrates that Smulian departed for the United States with Government agents at 10:56:05 PM on March 6, 2008, approximately twelve hours after being arrested.[64]  Bout offers this document to argue that it is improbable that Smulian would have agreed to cooperate and travel back to the United States so quickly, and thus, that Smulian must have been working for the Government all along.[65]

Again, even assuming that this document could not have been

---

[64]   *See* 6/03/08 Thai Immigration Record, Ex. B to Def. Mem.

[65]   Bout also suggests that Agent Zachariasiewicz's report of his post-arrest interview of Bout "further lends corroboration to the Government's going easy on Smulian [because] . . . [i]n effect, Agent Zachariasiewicz writes that Smulian was simply 'permitted to leave' [Thailand] after he was detained."  Def. Mem. at 7.  Belying Bout's characterization, however, Agent Zachariasiewicz's report provides a specific and plausible explanation for the circumstances under which Smulian was allowed to leave Thailand.  The report states that because "[t]here were pending Thai charges for Bout but no such charges for . . . Smulian[,] . . . Bout was arrested and held while Smulian . . . w[as] detained and permitted to leave."  3/21/08 Zachariasiewicz Report of Investigation at 1.

discovered before trial, it is unlikely to have changed the verdict. At trial, Smulian

acknowledged that he left Thailand on March 7, 2008[66] – the very next day after

his arrest. Accordingly, the Thai immigration record indicates that, at most,

Smulian left Thailand one day earlier than was explained to the jury. It is unlikely

that such a small discrepancy in departure time would have changed the outcome

of the case.[67]

Bout also asks this Court to consider, as corroboration of Smulian's

informant status, the facts that Smulian's airline ticket from Bangkok to New York

City was pre-booked by Snow and that Smulian was allowed to sit apart from his

DEA escorts on the flight. As Bout admits, however, this evidence is not newly

---

[66]    *See* Opp. Mem. at 7.

[67]    Nor does the Thai immigration record necessarily contradict
Smulian's trial testimony that he left Thailand on March 7, 2008. Bout provides
no evidence about whether the March 6, 2008 10:56:05 PM timestamp on the Thai
immigration record reflects the actual takeoff time of Smulian's flight, rather than
the time at which Smulian passed through the airport immigration checkpoint.
Particularly given that the timestamp includes seconds in addition to hours and
minutes, it is likely that it indicates the precise time at which Smulian cleared
immigration before boarding a flight scheduled to depart after midnight. *See*
06/03/08 Thai Immigration Record. This is corroborated by the fact that the travel
confirmation for Smulian's outbound flight – which was presented at trial –
indicates that Smulian's flight was scheduled to leave Bangkok at 1:05 AM on
March 7, 2008, and land in New York City at 6:25 AM that same day. *See* 2/28/08
Expedia Travel Confirmation, Ex. B to Opp. Mem.; Opp. Mem. at 7. Consistent
with this itinerary, a DEA report produced before trial indicates that Smulian
landed in New York at approximately 7:00 AM on March 7, 2008. *See* 3/25/08
Mark Bruso Report of Investigation, Ex. C to Opp. Mem.

discovered but rather, "the facts relative to Smulian's leaving the country on a pre-purchased ticket and his flying in a different section of the aircraft from where the DEA agents were sitting were touched upon at trial."[68]  Rule 33 does not allow for a new trial based on evidence that could have been discovered before trial, let alone evidence that was part of the trial record.

### 3. DEA Special Agent William Brown's Statement in 2014 Documentary Film

As his next piece of evidence, Bout offers statements from the 2014 documentary *The Notorious Mr. Bout*, in which Agent Brown describes Smulian as a "penetration point" and "willing partner."[69]  Arguing that Agent Brown's choice of words reveals that the DEA recruited Smulian as a Government agent, Bout interprets the phrases "willing partner" and "penetration point" as describing the relationship between Smulian and the Government (rather than the relationship between Smulian and Bout).

Although this film is "newly discovered" in that it was released only after trial, this evidence also fails under Rule 33 because Agent Brown's statements do not support Bout's strained interpretation.  Rather, viewed in context, Agent Brown's statements clearly relate to the Government's motivation

---

[68]     Def. Mem. at 10.

[69]     *The Notorious Mr. Bout*, Ex. A to Def. Mem., at 00:36:24-00:36:55.

in approaching Smulian in the sting operation – namely that Smulian, due to Bout and Smulian's past business dealings and Smulian's poor financial situation, presented a "willing partner" for Bout and a "penetration point" for the Government to reach Bout.[70]  In no way do Agent Brown's statements suggest that the DEA initially sought to recruit Smulian as a Government agent.  Nevertheless, in support of his theory, Bout faults the Government for not "proffering a sworn declaration from Agent Brown as to what he actually meant when he described Smulian as 'a willing partner' in the DEA's 'scenario.'"[71]  This argument is unavailing, as Rule 33's burden is on Bout to demonstrate that Agent Brown's statements in the film would have resulted in a different outcome at trial – a burden that Bout fails to satisfy.

### 4.    Undated MI6 Research

Bout also presents a document outlining the history of British intelligence agency MI6 (the "MI6 research"), allegedly recovered from a laptop belonging to Smulian.[72]  Bout argues that the MI6 research betrays Smulian's knowledge that Snow was an MI6 operative and thus, compels the conclusion that

---

[70]    *Id.* at 00:36:24-00:36:55.

[71]    Reply Mem. at 9.

[72]    *See* MI6 Research, Ex. E to Def. Mem.

Smulian would not have entered into an illegal arms deal with a known Government agent. Even assuming that this MI6 research was not discoverable before trial (and that the laptop from which it was recovered did, in fact, belong to Smulian), it does not demonstrate that Smulian was a Government agent and is unlikely to have affected the jury's verdict.

As an initial matter, because the MI6 research document is undated, there is no indication of when the research was conducted. This research could have been undertaken months or years before Snow contacted Smulian about the arms deal – undermining Bout's theory that this document exposes Smulian's awareness of Snow's MI6 employment. Moreover, the document provides only a general history of MI6 and makes no reference to Snow. In fact, the only information Bout presents to support his theory that Snow worked for MI6 is an affirmation by Bout's attorney that "[o]ne of the sources with whom [the attorney] met in Malaysia indicated that a group of people were in possession of certain . . . communications . . . which indicated that an individual by the name of Mike Snow was an operative for the British intelligence service, MI, at the time of his work for the DEA."[73] No other documentation corroborating Snow's involvement with

---

[73] Alexey A. Tarasov's Affirmation in Support of Defendant's Motion for New Trial ¶ 5.

MI6 has been presented to the Court.[74]  As such, the MI6 research offers no basis

for concluding that Smulian had somehow made a connection between Snow and

MI6 (let alone for concluding that Smulian was a Government agent).

5.     **June 3, 2005 Email between "Mike Snow" and "Axel de Smulge"**

As his final piece of evidence regarding Smulian's alleged informant

status, Bout offers a June 3, 2005 email recovered from the laptop just described

(which purportedly belonged to Smulian).  In the email, "Mike Snow" writes to the

email account of "Axel de Smulge," asking whether the recipient "would consider

being an OPS/logistics officer for a 25 man team on a police operation (airborne)

legal etc" for a salary of "$19000 USD pm."[75]  Bout argues that this email was sent

from Snow to Smulian, and that it demonstrates "that Smulian expected that the job

offers Snow sent his way would be legitimate job offers directed at securing law

and order."[76]  Thus, Bout contends, "this type of relationship between Snow and

Smulian undermines the theory . . . that Snow offered Smulian to take part in an

---

[74]     *See id.* ¶ 6.

[75]     5/03/05 Email from Mike Snow to Axel de Smulge, Ex. C to Def.
Mem.

[76]     Def. Mem. at 3.

illegal arms deal."[77]

Again, even assuming that this email was not discoverable before trial
and that Smulian owned the "Axel de Smulge" email account, this email is unlikely
to have changed the jury's verdict. At most, the email indicates that Snow had a
relationship with Smulian pursuant to which he sent Smulian employment
opportunities. Notably, Snow's email describes the position as "legal" – that Snow
includes this detail to describe the job offer suggests that he may, at times, have
approached Smulian with *illegal* job offers.[78] Moreover, a single email from 2005
is insufficient to establish what type of relationship existed between Snow and
Smulian by 2007-2008, when the sting took place, including with respect to any
expectations that Smulian may have had about the legality of job offers from
Snow.

**B.      Evidence Regarding Mirchev's Role in the Arms Deal**

Bout also claims that an April 30, 2015 declaration by Mirchev (the
"Mirchev Declaration") demonstrates that Smulian falsely testified at trial that
Bout called Mirchev in January 2008 to discuss the availability of surface-to-air
missiles. Bout argues that "without Smulian's [trial] testimony as to Mirchev's

---

[77]      *Id.*

[78]      *Id.*

readiness to supply one hundred missiles to Bout, the Government would not have enough evidence to prove the anti-aircraft-missile conspiracy count"[79] because if the phone call did not occur, the Mirchev Declaration "shows that Bout never treated seriously the deal with the alleged FARC members."[80]  In the English translation of the Mirchev Declaration, Mirchev states, *inter alia*:

- "I am aware that at the trial of Viktor Bout's case in New York, Andrew Smulian testified that he was physically present at Bout's home in Moscow when Bout allegedly made a call to me to inquire about supplying surface-to-air missiles."

- "I am aware that Andrew Smulian further testified that Bout told him that he would be able to supply one hundred surface-to-air missiles after the purported phone conversation that Bout had with me."

- "In actuality, no conversation that allegedly took place based on Andrew Smulian's representation ever transpire[d]."

- "Andrew Smulian's court testimony was a fabrication."

- "Following Viktor Bout's arrest and at the time of his trial, I was not communicating with Bout's counsel [and] I was afraid that my participation

---

[79]     Def. Mem. at 24.

[80]     *Id.* at 22.

in the defense of Viktor Bout would lead to negative consequences."[81]

For several reasons, however, the Mirchev Declaration fails Rule 33's requirements for newly discovered evidence alleging perjury by a government witness. *First*, this declaration cannot be credited as "newly discovered" because if the statements within it are true, Bout would have been well-aware before trial that Mirchev "could offer material testimony as to the defendant's role in the charged crime."[82] Before trial, Bout's attorney was on notice that Smulian would be testifying about the phone call.[83] Plainly, if Bout had not called Mirchev in January 2008 about surface-to-air missiles, he would have known before trial that Mirchev could provide trial testimony that the phone call never occurred. In fact, at the August 2011 pretrial conference, Bout's attorney informed the Court that he was aware that Smulian would be testifying about the alleged phone call between Bout and Mirchev, and that in light of this, he was exploring options for deposing Mirchev outside of the United States, pursuant to Rule 15 of the Federal Rules of Criminal Procedure, or calling him as a witness at trial.[84]

---

[81] 4/30/15 Declaration of Peter Mirchev, Ex. H to Def. Mem.

[82] *Owen*, 500 F.3d at 89.

[83] *See* 8/17/11 Transcript of Pretrial Conference, Ex. E to Opp. Mem., at 3:1-6 (Defense Counsel Albert Y. Dayan).

[84] *See id.* at 3:1-6-9 (Defense Counsel Albert Y. Dayan).

23

*Second*, because no evidence has been presented indicating that Bout even attempted to secure Mirchev's trial testimony, Bout's "failure to exercise due diligence does not provide a legal basis for the unavailability of evidence" and any misgivings Mirchev now asserts he had about testifying at Bout's trial are irrelevant.[85]

*Third*, the Mirchev Declaration fails to "prove that '[Smulian] in fact committed perjury.'"[86]  Not only are Rule 33 "motions based solely on affidavits . . . disfavored" because they lack the credibility safeguards of live testimony,[87] but Mirchev's own prior public statements directly contradict those contained in his recent declaration.  Namely, as documented in an article published in March 2012, Mirchev apparently provided *The New Yorker* magazine with an account corroborating Smulian's trial testimony.[88]  The article describes Mirchev's account of the call, including that Bout and Mirchev used code to discuss the availability of one hundred weapons and that "[b]efore hanging up, . . . Bout told [Mirchev], 'We

---

[85]     *Forbes*, 790 F.3d at 409.

[86]     *White*, 972 F.2d at 20.

[87]     *Herrera*, 506 U.S. at 417.

[88]     *See* "Disarming Viktor Bout," *The New Yorker* (Mar. 5, 2012), Ex. F to Opp. Mem., at 54-65.

shall work together again soon.'"[89]  Although it is unclear why Mirchev would now

assert that this call never took place, the Mirchev Declaration – unsupported by any

other evidence regarding this subject – is insufficient to establish that Smulian

perjured himself (let alone that the Government was aware of any such perjury).

      *Fourth*, even assuming that the prior criteria were met – including that

Smulian did, in fact, commit perjury – such false testimony is unlikely to have

resulted in an acquittal.  Even if the phone call did not occur, the jury likely had

sufficient evidence (including the recording of Bout's statements at the March 6,

2008 meeting in which he agreed to take all steps necessary to deliver the weapons

to FARC) to convict Bout of the surface-to-air missile conspiracy.  It is implausible

that Bout would have assented to delivering illegal surface-to-air missiles to FARC

unless he took "seriously the deal with the alleged FARC members."[90]

### C.    Evidence Regarding Adverse Credibility Findings Against Agent Zachariasiewicz

      As his final piece of "newly discovered" evidence, Bout furnishes the

*Chichakli* transcript, which discusses this Court's withdrawal of adverse credibility

findings against Agent Zachariasiewicz in connection with Bout's suppression

motion.  Because Agent Zachariasiewicz served as a grand jury witness, Bout

---

[89]    *Id.* at 60.

[90]    Def. Mem. at 22.

contends that a "new trial is warranted . . . because the Government likely neglected to inform th[e] Court that its adverse credibility ruling relative to [Agent Zachariasiewicz] cast doubt on the validity of the Indictment."[91]  Bout's reasoning fails, however, and neither dismissal of the Indictment nor a new trial is warranted.[92]

As an initial matter, this evidence is unavailing because it was available to Bout before trial.  Bout attempts to avoid Rule 33's time-bar by packaging this evidence as a transcript from the subsequent *Chichakli* case, during which the Government described the teleconferences in Bout's case among the parties and the Court about the adverse credibility findings.  Because Bout's counsel participated in both pretrial conferences referenced within the transcript, however, neither the occurrence nor content of these calls can be considered newly discovered.

Furthermore, this evidence is immaterial to the validity of the Indictment.  The adverse credibility finding was limited to Bout's post-arrest statements – a topic on which Agent Zachariasiewicz did not provide any grand jury testimony.  Although Bout attempts a wholesale attack on the the Indictment,

---

[91]     *Id.* at 12.

[92]     Bout appears to request both remedies interchangeably.  As discussed, neither is warranted.

the purported prosecutorial misconduct Bout describes – that of failing to inform the Court that the adverse credibility findings undermined the validity of the Indictment – never occurred.[93]  Additionally, as reflected in the *Chichakli* transcript, the credibility findings were irrelevant to this Court's suppression decision, which "did not hinge on the credibility findings" against Agent Zachariasiewicz.[94]  And although "[a] guilty verdict by a petit jury remedies any possible defects in the grand jury indictment,"[95] it is also notable that the suppression motion was granted in Bout's favor and that Agent Zachariasiewicz did not testify at Bout's trial.[96]  In other words, even if Bout's Indictment was somehow affected by the adverse credibility findings, any error would have been rendered harmless by the petit jury's decision (which was reached without any testimony by Agent Zachariasiewicz).

_____

[93]    Bout also appears to suggest that the Government exerted improper influence over the Court in discussing the withdrawal of the adverse credibility findings without Bout or a court reporter present during the teleconferences.  This contention is baseless, particularly in light of the fact that Bout's attorney participated in and waived Bout's presence at both teleconferences.  *See* Def. Mem. at 15; *Chichakli* Tr. at 262:13-14, 263:15-18 (AUSA McGuire).  Further, the record indicates that "purely legal matters" were discussed on these calls.  Def. Mem. at 15 (quoting *Chichakli* Tr. at 262:11-12 (AUSA McGuire)).

[94]    *Chichakli* Tr. at 262:24-25.

[95]    *Eltayib*, 88 F.3d at 173 (citing *Mechanik*, 475 U.S. at 72-73).

[96]    *See* Opp. Mem. at 15 n.1.

27

## D.    Evidentiary Hearing

Because the evidence presented by Bout fails, as a matter of law, to

meet Rule 33's requirements for a new trial based on newly-discovered evidence,

no evidentiary hearing is warranted.

## VI.    CONCLUSION

For the foregoing reasons, Bout's motion for a new trial and request

for an evidentiary hearing are DENIED. The Clerk of the Court is directed to close

this motion [Dkt. No. 116].

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
          October 26, 2015

28

**- Appearances -**

**For Defendant**:

Alexey V. Tarasov, Esq.
Law Office of Alexey Tarasov
723 Main Street, Suite 310
Houston, TX 77002
(832) 623-6250

Michael J. Sullivan, Esq.
Ashcroft Law Firm LLC
200 State Street, 7th Floor
Boston, MA 02109
(617) 573-9400

**For the Government**:

Brendan R. McGuire
David Zhou
Assistant United States Attorneys
1 St. Andrew's Plaza
New York, NY 10007
(212) 637-2220